905 A.2d 415 (2006)
387 N.J. Super. 598
STATE of New Jersey, Plaintiff-Respondent,
v.
Philip J. CASTAGNA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 22, 2006.
Decided August 21, 2006.
*416 Richard W. Berg, Trenton, argued the cause for appellant (Lord & Whalen, attorneys; Mr. Berg and Robin Lord, of counsel and on the brief).
James Gerrow, Assistant Prosecutor, argued the cause for respondent (Robert B. Bernardi, Burlington County Prosecutor, attorney; Alexis R. Agre, Assistant Prosecutor, of counsel and on the brief).
Before Judges STERN, PARKER and GRALL.
The opinion of the court was delivered by
GRALL, J.A.D.
Defendant Philip Castagna appeals from a judgment of conviction and sentence. Following a bench trial in the Family Part on charges that were downgraded by the prosecutor, defendant was found guilty of harassment, a petty disorderly persons offense, N.J.S.A. 2C:33-4a, and contempt of a judicial order prohibiting him from "causing anyone else to make harassing communications," a disorderly persons offense, N.J.S.A. 2C:29-9b.[1] His sentence for contempt was a $1,000 fine and a one-year term of probation. His sentence for harassment was suspended. A VCCB assessment, a SNSF assessment and a domestic violence penalty were imposed. The judge ordered a forfeiture of defendant's public office, Chief of Police of the City of Bordentown, and barred him from future public employment, N.J.S.A. 2C:51-2.
On June 15, 2003, defendant's wife obtained a temporary restraining order issued pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant was served with the *417 order, which included a prohibition against "making or causing anyone else to make a harassing communication" to his wife.
On July 2, 2003, defendant visited his wife's uncle, Sam Celia. Celia had a good relationship with his niece and her husband. He met defendant in 1993, when he and his niece were dating. Over the years Celia and defendant developed a social relationship independent of their wives. They shared season tickets to sporting events, ate lunch together and enjoyed the same vocalists. When defendant arrived at Celia's home, they greeted one another with their customary hug and sat down outside to talk. Defendant seemed agitated and not his usual self.
Prior to that conversation, Celia did not know that defendant and his niece were having marital problems. Defendant told him about the restraining order and spent ninety minutes talking to Celia about the couple's difficulties and his concern about losing his job and pension as a consequence of the domestic violence proceeding.
Celia viewed the conversation as "basically [defendant's] plea to please get in touch with [his wife] to tell her that we can end this amicably. `I stand to lose my job, I stand to lose my pension.'" Defendant told Celia he still loved his wife and needed help conveying that to her. Celia understood defendant to be making a "plea for help" and asking him to intercede on his behalf. Although Celia did not want to get involved, he listened. He was "feeling empathy."
At one point, defendant said, "if she keeps f[]ing around with my pension you will see me on the front page of the Trentonian. I've already been in Back Talk," which is an editorial column in a newspaper circulated in the area. Celia responded: "I will pretend I did not hear that statement." According to Celia,
[Defendant] did not have a rebuttal to what [he] said. He kept on saying, "But Uncle Sam, my parents are sick." He said, "You know, she shouldn't be doing this, this way." And as I said, I did the listening. He said, "She can't be doing it, and I'm telling you, if they take my weapons away, but I know where to get another one." I said, "Philip, I will repeat. I did not hear you say that."
Celia described defendant as agitated not angry. In the end, Celia told defendant he would do whatever he could but could not promise anything. Defendant left.
When Celia went inside, he told his wife defendant needed help because their niece had thrown him out and his job, pension and everything he had worked for was at risk. Celia's wife told him she did not want to hear about it and that if he was going to "buy that," she did not want to hear another word. Although Celia had planned to talk to his niece, after he spoke with his own wife he decided to stay neutral. At trial, Celia was asked if he would take every step to protect his niece. He said: "If you want to word it that way, but I know I had said in playing football that if he blows this tackle I [will] kill him. Did I mean it?" He said he was not fearful that defendant was going to do anything to his niece or himself.
On the weekend, defendant's uncle called Celia. He told Celia that defendant had asked him to call to see if he had spoken to his niece. Celia said he had not and was not going to contact her. Celia described that conversation as an "amicable" one in which he said "I think I want to stay out of this at this point."
Subsequently, Celia's wife changed her position on wanting to hear about Celia's July 2 conversation with defendant. She asked him to tell her. He told her he *418 preferred to stay out of it. Nonetheless, he related what defendant had said. After he spoke with his wife, he came to view defendant's comments differently. He recalled an incident in which relatives of a neighbor were killed while under the protection of a restraining order. On July 8, 2003, Celia's wife told defendant's wife that their husbands had met.
On July 9, 2003, defendant's wife called Celia. Celia told her that defendant loved her and wanted to get their marriage together. He also told her that during the course of his conversation with defendant, his "demeanor changed" from "can you help me out" to "if she f[]s with my job . . . they may have taken all my guns away, but I can always get another one" and that they were going to "read about me in the newspapers."
At trial defendant's wife testified about her "tumultuous relationship" with defendant and prior acts of domestic violence that she did not prosecute. The trial judge credited her testimony about repeated phone calls during periods of separation which included hang-ups and vile messages, visits at her workplace, forcible intercourse, allegations of infidelity, threats and assertions about his position of power and influence that rendered her "powerless to hope that she could seek official redress."
With respect to the charges based on defendant's conversation with Celia, the judge found:
[B]eyond a reasonable doubt, . . . defendant caused this communication to be made to his wife. Not only was Celia's uncontradicted testimony clear and unequivocal that he had been asked by the defendant to intercede, but the very content of his remarks to Celia, otherwise bespeak the defendant's intent that he wanted them communicated to his wife.

Counsel for the defendant argued that he cannot be held liable for the communication to his wife because even assuming that he had asked Celia to deliver the message, Celia did not do so until the defendant's wife had made her inquiry.
The court is not persuaded by this argument. The simple fact is that, but for the actions of the defendant, there would not have been any message to be delivered. And because, as is the case with any other restraining order violation, the defendant's own conduct is not excused because some conduct by the victim may have made it possible.
The Court also finds, beyond a reasonable doubt, that the communication was harassing. Even without resort to the history of their previous relationships, it is . . . clear, from the very content and tone of the communication to Celia, itself, later relayed to the defendant's wife, that it was intended to cause alarm.
The defendant's message to his wife was this, "I am willing to give you a divorce, but your pursuit of the domestic violence action has the potential to put my job and pension in jeopardy. If you don't do it my way, I may get a gun and do something that will make the front page of the [newspaper]."
The Court finds that it was the defendant's intent to try to alarm his wife into abandoning the domestic violence action and end their marriage in a way that would not threaten his job or his pension.
The fact that there may have been ambiguity as to who the victim of the act meriting front page coverage might be  counsel for the defendant argues that he could have been threatening suicide  is legally inconsequential.

*419 The defendant's . . . suggestion that he might do harm to any person, even himself, was calculated to cause alarm to his wife in order to persuade her to abandon the domestic violence action.

Therefore, the court concludes, as a matter of law, that the defendant's communication to Santos Celia, which was later relayed to the defendant's wife, constituted both harassment, and as result, contempt of the temporary restraining order as well.
[Emphasis added.]
Appellate review of a judge's decision in a criminal trial is limited to "determin[ing] whether the findings made could reasonably have been reached on sufficient credible evidence present in the record," given the burden of proof, which is proof beyond a reasonable doubt. State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964); see State v. J.T., 294 N.J.Super. 540, 545, 683 A.2d 1166 (App.Div. 1996). Deference is required "`when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412, 713 A.2d 390 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117, 693 A.2d 92 (1997)). The question is not whether this court would come to "a different conclusion were it the trial tribunal." Johnson, supra, 42 N.J. at 162, 199 A.2d 809. We may intervene only if "thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand . . . correction." Ibid. "[A] definite conviction that the judge went so wide of the mark, a mistake must have been made" is required. Ibid. "This sense of `wrongness' can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or underevaluation of crucial evidence, [or] a clearly unjust result." Ibid.
The evidence is not adequate to permit a finding that defendant had a purpose of harassing his wife by causing her uncle to communicate an alarming message. The absence of evidence essential to support the convictions gives us that sense of "wrongness" that requires correction.
In order to secure defendant's conviction for harassment, the State was required to establish that he spoke to Celia "with purpose to harass" his wife and with purpose to "cause" Celia to make a communication in a manner likely to cause annoyance or alarm to his wife. N.J.S.A. 2C:33-4a. Thus, the offense requires a purpose that encompasses two objects  harassment of his wife and "causing" Celia to make the communication. See State v. V.R., 387 N.J.Super. 342, 347-48, 903 A.2d 1116 (App.Div.2006) (where an offense requires proof that defendant caused another to engage in conduct, the defendant must do something to bring about that result). When a result such as "causing" another to make a communication is at issue, purpose means a "conscious object" to bring about that result. N.J.S.A. 2C:2-2b(1). Thus, the State was required to introduce evidence adequate to prove beyond a reasonable doubt that when defendant spoke to Celia it was his conscious object to use him as an instrument of harassment. N.J.S.A. 2C:2-2c(1). Proof of the same purpose is required to establish that a defendant violated an order that prohibits him or her from "causing anyone else to make harassing communications." We read that prohibition to encompass the elements of harassment proscribed in N.J.S.A. 2C:33-4a.
Without suggesting that any element of any offense is insignificant, we stress that "purpose to harass" is critical to the constitutionality of the harassment offense defined in subsection a of N.J.S.A. 2C:33-4. Speech is at issue, and it is the *420 prohibited purpose that makes its punishment constitutional. "The purpose to be served by enactment of the harassment statute is to make criminal, private annoyances that are not entitled to constitutional protection. Thus, the substantive criminal offense proscribed by [N.J.S.A. 2C:33-4a] `is directed at the purpose behind and motivation for' making or causing the communication to be made." State v. Hoffman, 149 N.J. 564, 576, 695 A.2d 236 (1997) (quoting State v. Mortimer, 135 N.J. 517, 528, 641 A.2d 257 (1994) (citations omitted)).
Proof of purpose to harass through another keeps criminal liability within the boundaries established by the Legislature. Statements that are alarming  news about rising flood waters, expected hurricanes and even impending job loss  need not be delivered with the purpose to harass. Similarly, statements made to one person need not be made for the purpose of having the listener pass them along and, thereby, harass another. There is rarely direct proof of intent, and purpose may and often must be inferred from what is said and done and the surrounding circumstances. State v. Siegler, 12 N.J. 520, 524, 97 A.2d 469 (1953). Prior conduct and statements may be relevant to and support an inference of purpose. Cesare, supra, 154 N.J. at 414, 713 A.2d 390; J.T., supra, 294 N.J.Super. at 545, 683 A.2d 1166.
The State's obligation to prove the defendant spoke with a purpose to harass his wife through another is relevant to a defendant's responsibility for "causing" another to make a communication. Where proof of causation is required, the State must establish that the defendant's conduct was "an antecedent but for which the [harassing communication] would not have occurred." N.J.S.A. 2C:2-3a(1).
In this case, the judge found that "but for the actions of the defendant, there would not have been any message to be delivered." That finding is compelled by the evidence. A finding of "but for" causation is available in any case in which anyone says anything that is repeated by one who has not heard it before. Without the element of purpose to harass by causing a listener to communicate, liability could be based upon repetition of a statement made in confidence and without purpose to have the confidence disclosed. See N.J.S.A. 2C:2-3b (where purpose to cause is required, issues of remoteness and volitional acts of others are relevant only if the actual result  harassment through repetition by another  is not within the actor's design).
Although not expressly stated, the judge's determination that defendant spoke to Celia with a purpose to harass by causing Celia to make a communication is reflected in his findings. Those findings include: "it was the defendant's intent to try to alarm his wife into abandoning the domestic violence action and end their marriage in a way that would not threaten his job or his pension"; the statement suggesting that defendant would harm someone was "calculated to cause alarm"; the "content" of his remarks bespeak the "defendant's intent that he wanted them communicated to his wife." In Hoffman, supra, 149 N.J. at 582, 695 A.2d 236, the Court held that the term "harass" should be given its common meaning. That meaning includes: "annoy"; "torment"; "wear out" and "exhaust." Webster's II New College Dictionary 504 (1995). Thus, a purpose to wear another person down to the point of submission by "causing" another to make a communication in a manner likely to annoy or alarm would suffice. N.J.S.A. 2C:33-4a; see also N.J.S.A. 2C:3-4c (as part of a course of conduct prohibited by subsection c). A conviction upon *421 proof of those elements beyond a reasonable doubt is permissible.
The problem is that the evidence in this case does not support the essential findings. Celia was the only witness to the conversation upon which defendant's liability is based. Celia left that conversation thinking that defendant wanted him to broker a reconciliation or a resolution more favorable to defendant than a final restraining order. Celia did not think defendant posed a threat to his niece and saw no reason to warn her. In short, defendant had not done or said anything that Celia took to be a threat or a request to repeat anything other than a conciliatory message.
Celia told defendant "he did not hear" his remarks about the newspaper story or his ability to get a gun. There is no evidence that defendant told him that he wanted, needed or intended for him to repeat either remark. As Celia put it, defendant made no rebuttal. Celia never said or implied that he understood defendant to ask him to do anything other than talk to his niece. When defendant's uncle called Celia on defendant's behalf, he asked whether Celia had talked to his niece but did not urge him to make the contact.
Celia was a friend to defendant and caring uncle to his niece. That combination of circumstances does not support an inference that defendant would view him as a good agent in a calculated plan to harass.
There was significant evidence of a prior history of domestic violence, which the judge credited but did not rely upon in concluding that defendant spoke to Celia with the purpose of causing him to make a harassing communication to defendant's wife. We see nothing in that history to support an inference that defendant's conscious object was to have Celia repeat his remarks about the tabloid and the gun to his wife. None of the previous instances of abuse involved communications through third parties.
We have searched the record for evidence to support a finding that it was defendant's conscious object to cause Celia to convey an alarming message with the purpose of harassing his wife or with awareness that Celia would deliver the statement in a "manner likely to cause annoyance or alarm" to his wife. N.J.S.A. 2C:33-4a; N.J.S.A. 2C:2-2b(1) (with respect to a circumstance that is an element of the offense, proof of purpose requires proof of awareness, belief or hope that the circumstance exists). The only possible basis for the finding is an inference that a caring uncle would want to warn his niece. That inference, however, is undercut by Celia's testimony that defendant did not present himself as angry or appear to pose a threat. That reed is too thin to support a finding of guilt beyond a reasonable doubt.
The judgment is reversed.
NOTES
[1] The initial complaint charged terroristic threats, N.J.S.A. 2C:12-3a, and fourth-degree contempt, N.J.S.A. 2C:29-9b. Following transfer to the Family Part, the complaint was amended to include four additional allegations of harassment: (1) two "hang-up" phone calls made by defendant from his work cell phone; (2) phone calls made by Anthony Carsella on June 8 and 9, 2003; (3) communications made by defendant's brother Thomas and (4) a communication from a minister. The judge dismissed the allegations based on communications from defendant's brother and the minister at the close of the State's case. He acquitted defendant of allegations based on hang-up phone calls and Carsella's communications at the close of the defendant's case. We limit our discussion to the evidence and findings relevant to defendant's convictions.

The State does not argue and the judge did not consider whether defendant violated a provision of the temporary restraining order that directs, "You are prohibited from having any oral, written, personal, electronic or other form of contact with plaintiff." Nor was he charged with harassment as defined in subsection c of N.J.S.A. 2C:33-4, which prohibits engaging in a "course of alarming conduct or repeatedly committed acts with purpose to alarm or seriously annoy" and a purpose to harass.