RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2061-15T2
 A-0828-16T2

T.D.J.,

 Plaintiff-Respondent,

v.

J.B.-J.,

 Defendant-Appellant.
______________________________

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

J.B.-J.

 Defendant-Appellant.
______________________________

 Submitted March 30, 2017 – Decided June 14, 2017

 Before Judges Lihotz and Whipple.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Essex County,
 Docket No. FV-07-1568-16 and Morris County,
 Docket No. FO-14-278-16.

 J.B.-J., appellant pro se (Docket No. A-2061-
 15).
 Lesnevich, Marzano-Lesnevich & Trigg, L.L.C.,
 attorneys for respondent T.D.J. (Matthew N.
 Tsocanos, of counsel and on the brief; Corrie
 Sirkin, on the brief).

 John Rue & Associates, attorneys for appellant
 (Docket No. A-0828-16) (Krista Lynn Haley, on
 the briefs).

 Fredric M. Knapp, Morris County Prosecutor,
 attorney for respondent State of New Jersey
 (Paula Jordao, on the brief).

PER CURIAM

 In these back-to-back matters, which we consolidate for the

purposes of this opinion, defendant J.B.-J. appeals from a December

10, 2015 order granting a Final Restraining Order (FRO) against

her, as well as from a September 19, 2016 judgment of conviction

finding her guilty of contempt for violating the FRO. We affirm

both.

 Plaintiff T.J. and defendant married in January 2011 and

divorced in November 2015. Both were doctors previously employed

at the same hospital. After separating, plaintiff tried to limit

communication with defendant; however, throughout the divorce

proceedings, defendant continued to send plaintiff emails.

Defendant emailed plaintiff from six different email addresses and

began using the email addresses to send text messages to

plaintiff’s phone. On May 3, 2015, defendant emailed plaintiff

the following from one account: "[T.], keep up the attitude and

 2 A-2061-15T2
I'll be dropping by and punching you in the face like you deserve.

I'll bring by a few friends and family who would love to knock you

out as well as break your other hand." Defendant testified this

statement was in relation to plaintiff owing her money. On May

4, 2015, defendant emailed plaintiff saying, "The reality you

created is going to start to suck for you very soon." On June 15,

2015, she emailed plaintiff, saying she was "parked out front,"

and "I literally live <5 minutes away and I'll be back until you

give me what you took from me."

 Plaintiff asked his phone carrier for assistance but learned

he could not block the text messages. However, he was able to

have the emails segregated into a separate folder marked "J." In

an effort to block the communication with defendant, plaintiff

switched work locations. Plaintiff also moved into a new

apartment.

 On September 24, 2015, before the parties finalized the

marital settlement agreement (the agreement), defendant emailed

plaintiff:

 And b[y] t[he] w[ay], I'm not dragging this
 out.

 I don't give a fuck if this takes 12 months
 or a year.

 I'm never getting married again.

 3 A-2061-15T2
 I'll always be [J.B-J.] I'm not changing my
 name.

 I'm staying on your insurance for 36 months
 after the divorce is final.

 And I'm going to come for you the rest of your
 life.

 No harassment or threat. Just fact.

 You deserve it.

 October 2, 2015, she emailed him again:

 It's coming [T.].

 Brace for it.

 Plaintiff forwarded the email to his attorney who told him

to ignore it, and plaintiff's attorney forwarded the email to

defendant's attorney, asserting defendant's emails to plaintiff

constitute harassment.

 The parties engaged in mediation and signed the agreement on

October 23, 2015. Plaintiff requested a clause in the agreement

that, "[t]he parties agree that they shall limit all communications

to each other except as may be necessary to implement the terms

of this Agreement."

 Defendant continued to email plaintiff after they signed the

agreement limiting contact. On the day the parties executed the

agreement, defendant sent plaintiff another email, ending with the

following message:

 4 A-2061-15T2
 And for the record, this isn't the end - its
 just the beginning.

 I can't wait to see what happens next.

 Defendant emailed plaintiff on November 2, 2015:

 Really [T.]????
 You just don't give a shit. Just wait for
 yours. It is inevitable. I will never forget
 this.
 You are the most disrespectful person I have
 ever met in my life.

 On November 6, 2015, plaintiff filed a harassment report with

the police. The parties were divorced on November 16, 2015, and

later the same day, plaintiff came home and found pictures all

around his car and defendant's wedding dress on his windshield.

 Defendant emailed plaintiff's phone on November 18, 2015:

 [Twenty] phone calls so far that say you suck
 at life and you realized one day of your
 mistake. I'm not deserving of it being thrown
 away no matter what you think happened. You
 will never even talk to me about anything.
 Really? What a maricon.

 The next day defendant texted plaintiff's phone:

 You broke my heart and ruined my dream of
 having a family of my own. I hate you.

 Defendant emailed plaintiff regarding plaintiff's attorney

on November 21, 2015, stating "Tell Francesco to fuck off from me.

She can't save you from what you've done." On the day of the

divorce, defendant told plaintiff's attorney to "[c]all the

fucking police, you fucking bitch. Do it," and yelled at

 5 A-2061-15T2
plaintiff, "[w]hat the fuck is wrong with you? You fucking piece

of shit."

 The communications continued, and defendant left more objects

at plaintiff's home. On November 25, 2015, defendant texted

plaintiff stating, "Found your prayer book. Look out for it." She

also emailed him that day, writing, "Asshole, my anger will never

dissipate. Good luck."

 A few days later, plaintiff found his prayer book torn up and

thrown all over his car. Defendant also left some items on the

porch of his parents' house, including defendant's wedding bouquet

and a shirt plaintiff's parents had given defendant. Defendant

also left boxes full of various items on plaintiff's porch.

Written on the boxes were notes saying plaintiff was

"disrespectful" and "hurt people."

 Plaintiff secured a temporary restraining order against

defendant on November 29, 2015. A final restraining order (FRO)

hearing was held on December 10, 2015. Plaintiff testified about

the various communications defendant sent him. He also testified

defendant threatened to damage his career and have his medical

license revoked.

 Plaintiff testified he requested defendant stop contacting

him multiple times. Defendant's attorney also requested she stop

contacting plaintiff. Defendant admitted she was aware plaintiff

 6 A-2061-15T2
did not want her contacting him. Following the hearing, the judge

issued an FRO based on harassment, barring defendant from having

"any oral, written, personal, electronic, or other form of contact

or communication with" plaintiff or his parents. She was also

prohibited from "making or causing anyone else to make harassing

communications" to the protected parties, as well as prohibited

from "stalking, following, or threatening" to do so. Defendant

appealed the order on January 21, 2016.

 On May 10, 2016, defendant sent a message to plaintiff's

brother-in-law on Facebook. In the message, defendant asked the

brother-in-law for a favor and discussed the restraining order.

Defendant stated,

 I filed an appeal of his restraining order
 . . . . I just learned [T.] has hired an
 attorney to shut down my appeal. Please
 consider talking to him and asking him to
 leave this alone . . . . If you talk to him,
 I thank you. I know you are a good man.
 Please consider it. Take care.

 The brother-in-law forwarded the message from defendant to

plaintiff's personal email on June 1, 2016. Plaintiff reported

the message to the police, believing it to be a violation of the

FRO.

 On June 2, 2016, defendant was charged with contempt, contrary

to N.J.S.A. 2C:29-9(b)(2), for violating the FRO and

"communicating with victim's brother-in-law via email asking him

 7 A-2061-15T2
to communicate with the plaintiff to drop the [FRO]." On June 3,

2016, defendant followed up her Facebook message to the brother-

in-law by stating, "Thanks for getting me arrested."

 On September 19, 2016, the trial judge found defendant guilty

of contempt for violating the FRO, sentenced her to one year of

probation, the VISTA program, ten hours of community service, and

relevant fines. Defendant appealed her conviction on October 27,

2016.

 I.

 We first address defendant's appeal of the FRO. Defendant

argues the trial judge who issued the FRO erred by failing to view

her actions in light of the lack of past domestic violence between

the parties. We disagree.

 When determining whether a final restraining order is

appropriate in a domestic violence matter, the judge must first

"determine whether the plaintiff has proven, by a preponderance

of the credible evidence, that one or more of the predicate acts

set forth in N.J.S.A. 2C:25-19(a) has occurred." Silver v. Silver,

387 N.J. Super. 112, 125 (App. Div. 2006). The judge should make

this determination "in light of the previous history of violence

between the parties." Ibid. (quoting Cesare v. Cesare, 154 N.J.

394, 402 (1998)).

 8 A-2061-15T2
 The court should consider the following to determine if a

predicate act occurred:

 (1) The previous history of domestic violence
 between the plaintiff and defendant, including
 threats, harassment and physical abuse;

 (2) The existence of immediate danger to
 person or property;

 (3) The financial circumstances of the
 plaintiff and defendant;

 (4) The best interests of the victim and any
 child;

 (5) In determining custody and parenting time
 the protection of the victim’s safety; and

 (6) The existence of a verifiable order of
 protection from another jurisdiction.

 [N.J.S.A. 2C:25-29(a)(1)-(6) (emphasis
 added).]

 The judge should consider the parties' relationship and

history to determine if the relevant acts rise to the level of

harassment. J.D. v. M.D.F., 207 N.J. 458, 484 (2011) ("The

smallest additional fact or the slightest alteration in context

. . . may move what otherwise would appear to be non-harassing

conduct into the category of actions that qualify for issuance of

a restraining order."). Prior abusive acts may be considered

whether or not those acts have been the subject of prior domestic

violence litigation. N.J. Div. of Youth & Family Servs. v. I.H.C.,

 9 A-2061-15T2
415 N.J. Super. 551, 574 (App. Div. 2010) (citing Cesare, supra,

154 N.J. at 405).

 Here, the trial judge found defendant had committed the

predicate act of harassment under N.J.S.A. 2C:33-4(a) and (c). An

individual has committed harassment if

 with purpose to harass another, he

 a. Makes, or causes to be made, a
 communication or communications anonymously
 or at extremely inconvenient hours, or in
 offensively coarse language, or any other
 manner likely to cause annoyance or alarm.

 . . . .

 c. Engages in any other course of alarming
 conduct or of repeatedly committed acts with
 purpose to alarm or seriously annoy such other
 person.

 [N.J.S.A. 2C:33-4.]

 Contrary to defendant's claims, the trial judge considered

the context of the relationship and the totality of the

circumstances. The judge noted defendant knew plaintiff suffered

from anxiety but continued to contact him. The judge also

considered defendant had been asked to stop communicating with

plaintiff on multiple occasions and agreed through a provision in

the agreement the parties would not contact each other.

 The judge's finding defendant harassed plaintiff was based

on credible evidence in the record. Plaintiff presented numerous

 10 A-2061-15T2
emails from defendant from before, during, and after their divorce

proceedings wherein defendant included threatening messages.

Plaintiff testified these emails caused him fear of physical harm,

as well as fear that defendant would never leave him alone.

Defendant's motivation to harass was manifest. The communications

were unilaterally initiated by defendant and were not responsive

to any message from plaintiff. See R.G. v. R.G., __ N.J. Super.

__ (App. Div. 2017) (slip op. at 18).

 Defendant argues the court erred applying the second prong

of the Silver analysis by finding a restraining order was

necessary. We disagree.

 Under the second prong of Silver, the trial court should

determine "whether the court should enter a restraining order that

provides protection for the victim." Silver, supra, 387 N.J.

Super. at 126. The court must consider the factors set forth in

N.J.S.A. 2C:25-29(a), when making this determination. Id. at 127.

The court shall act to "protect the victim from an immediate danger

or to prevent further abuse." Ibid.

 Here, the trial judge discussed the numerous actions

plaintiff took to avoid defendant and found he needed protection

from her. The judge found, "It's self-evident that the . . .

plaintiff needs to be protected . . . ."

 11 A-2061-15T2
 Defendant also argues an FRO was not necessary due to the

lack of physical violence; however, the FRO was to protect

plaintiff from defendant's harassment. The lack of physical

violence is irrelevant. Defendant's reliance on Kagen v. Egan,

322 N.J. Super. 222 (App. Div. 1999), is also misplaced, as Kagen,

dealt with one incidence of trespass whereas defendant's actions

were numerous, and defendant has not been accused of trespass.

 We are not persuaded by defendant's argument the trial court

erred relying on the subjective fear of plaintiff. In Cesare, the

Supreme Court found "under an objective standard, courts should

not consider the victim's actual fear[;] courts must still consider

a plaintiff's individual circumstances and background in

determining whether a reasonable person in that situation would

have believed the defendant's threat." Cesare, supra, 154 N.J.

at 403 (citing State v. Milano, 167 N.J. Super. 318, 323 (Law.

Div. 1979)). Here, the judge noted while defendant argued

plaintiff had a "heightened sense of fear," he applied an objective

standard, while still noting plaintiff's personal circumstances.

We discern no error in the determination.

 Defendant argues the trial judge misconstrued evidence by

finding defendant had moved "down the street" from plaintiff.

Defendant herself told plaintiff she "lived <5 minutes away" in

one of her emails. Even if the finding was inaccurate, the finding

 12 A-2061-15T2
did not prejudice defendant. The record contains sufficient

evidence of harassment by defendant whether or not she moved to

be near the defendant.

 II.

 We now turn our attention to the judgment of conviction for

contempt. Defendant argues her conduct did not violate the FRO.

We disagree.

 For the State to prove a disorderly person's contempt of

court, the State must establish the defendant "knowingly" violated

a restraining order beyond a reasonable doubt. N.J.S.A. 2C:29-

9(b)(2). Knowingly is defined as

 [a] person acts knowingly with respect to the
 nature of his conduct or the attendant
 circumstances if he is aware that his conduct
 is of that nature, or that such circumstances
 exist, or he is aware of a high probability
 of their existence. A person acts knowingly
 with respect to a result of his conduct if he
 is aware that it is practically certain that
 his conduct will cause such a result.
 “Knowing,” “with knowledge” or equivalent
 terms have the same meaning.

 [N.J.S.A. 2C:2-2(b)(2).]

 Here, the State was required to prove defendant contacted the

brother-in-law "with purpose to harass" the plaintiff and with

purpose to "cause" the brother-in-law "to make a communication in

a manner likely to cause annoyance or alarm" to plaintiff. See

State v. Castagna, 387 N.J. Super. 598, 605 (App. Div. 2006)

 13 A-2061-15T2
(citing N.J.S.A. 2C:33-4(a)). We are satisfied the State has met

this burden.

 We reject defendant's argument she did not violate the FRO

because plaintiff's brother-in-law was not protected by the FRO

and the FRO did not prohibit her from asking him to "consider"

talking to plaintiff. The FRO prohibited defendant from "making

or causing anyone else to make harassing communications." Her

message to the brother-in-law requested he "consider" speaking to

plaintiff regarding the FRO to ask him to "leave this alone." She

proceeded to thank the brother in-law "if" he talked to plaintiff

and to "please consider it." Thus, she violated the FRO because

she asked a third party to contact plaintiff for her and provide

a message similar to those she had been sending him previously.

Defendant asserts she did not think the brother-in-law would send

the message to plaintiff; however, her own words make her intention

evident.

 Defendant also argues the State did not prove she acted

knowingly when she violated the FRO, and her actions did not

warrant a criminal violation because they were trivial in nature.

We disagree.

 A defendant may be guilty of violating a restraining order

even if a defendant thinks she or he is acting within the

parameters of the order. See State v. J.T., 294 N.J. Super. 540,

 14 A-2061-15T2
544-45 (App. Div. 1996) (finding a man who was banned from property

but continuously placed himself just outside the property is guilty

of harassment and contempt). Defendant knew of the restraining

order and knew she could not contact plaintiff directly, but she

proceeded to attempt to contact plaintiff through his brother-in-

law anyway.

 Last, defendant contends her sentence was improper and claims

the judge failed to address mitigating factors. We reject this

argument.

 An appellate court may review and modify a sentence if the

trial court's determination was "clearly mistaken." State v.

Jabbour, 118 N.J. 1, 6 (1990). A judge must fully explain his or

her findings regarding aggravating and mitigating factors and

reasoning for the sentence imposed. R. 3:21-4(g).

 The judge found aggravating factor three, risk of re-offense,

and nine, deterrence, appropriate because of defendant's failure

to understand her conduct violated the FRO. He found no mitigating

factors. We discern no error in the judge's determination.

 Affirmed.

 15 A-2061-15T2