# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2833-23

L.H.,[1]

    Plaintiff-Respondent,

v.

S.H.,

    Defendant-Appellant.

_____

        Submitted December 11, 2025 – Decided January 23, 2026

        Before Judges Mawla and Puglisi.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FV-16-1650-21.

        The Tormey Law Firm, LLC, attorneys for appellant (Travis J. Tormey, of counsel; Louis J. Keleher and Jeffrey A. Skiendziul, on the briefs).

        Michael J. Pasquale, attorney for respondent.

---

[1] We use initials for the parties and pseudonyms for the witnesses to protect the parties' privacy and the confidentiality of the proceedings in accordance with Rule 1:38-3(d)(10).

PER CURIAM

Defendant S.H. appeals from the September 12, 2024 amended final restraining order (FRO) entered against him in favor of plaintiff L.H. We reverse and vacate the FRO for the reasons expressed in this opinion.

I.

The six-day FRO hearing in this matter took place over the course of fourteen months,[2] from January 24, 2023 to March 26, 2024. Tried by counsel for both parties, the hearing was replete with hearsay testimony, inadmissible evidence, and information irrelevant to the resolution of this matter. Thus, we distill the record to the following salient facts.

The parties are divorced. At the time of the incident that gave rise to the temporary restraining order (TRO), plaintiff resided in New Jersey with the parties' then fourteen-year-old son R.H. (Reece), and defendant resided in Florida.

Although the TRO was not provided in the record, we discern from the hearing transcripts it was based on predicate acts of terroristic threats and harassment. Because the court did not find plaintiff established the predicate

---

[2] N.J.S.A. 2C:25-29(a) requires the FRO hearing to be held within ten days of the filing of the TRO, with adjournments at the court's discretion. See J.D. v. M.D.F., 207 N.J. 458, 480 (2011).

act of terroristic threats, we confine our discussion to the facts underpinning her claim of harassment.

In spring 2021, plaintiff ran into her former sister-in-law, S.H. (Susan), who was married to defendant's brother T.H. (Thomas). They decided to set up a get-together so Reece could meet his two cousins, the children of Thomas and Susan. Because of financial disputes, defendant was estranged from Thomas and had not spoken to him "much" in over thirteen years. Plaintiff first met Thomas and Susan at their wedding in 2007 and since then, had only seen them once in 2008. Although they lived in the same town, Reece had only met Thomas once in passing, the older cousin "had seen [Reece] around school, but they never really talked to each other," and the younger cousin had only met Reece once.

Plaintiff planned the get-together for the afternoon of Saturday, May 1, 2021. Defendant was in New Jersey "on business" that week. The night before the get-together, defendant sent two text messages to Susan that said, "[Susan] is it true that you and or [Thomas] are meeting [plaintiff] over this weekend or the near future" and "This will not work out well. Have a nice night." Susan did not respond to the texts but sent plaintiff a text the next morning changing the location of the get-together from their hometown to a farm in another town.

A-2833-23

Because Susan did not respond to his texts, defendant went to Thomas's house later that morning, accompanied by their mother, to confront him about the get-together. The initial portion of the confrontation, which took place on the front porch, was recorded by a doorbell camera in two overlapping videos. The videos, portions of which are partially audible in the trial transcript but are discernible in the original recordings, show defendant and Thomas speaking in a calm but confrontational manner to each other. The conversation began:

Defendant: We are going to have a family meeting.

Thomas: No, we're not.

Defendant: Yes, we are.

Thomas: No.

Defendant: Yes, we are.

Thomas: [inaudible].

Defendant: This involves my son. My son is suicidal.

Thomas: No he's not.

Defendant: Yes he is.

Defendant then told Thomas the "Department of Public Services," presumably meaning the Division of Child Protection and Permanency, went to see Reece days before. Thomas said he was unaware of that fact and accused

4

defendant of simply not wanting the children to get together. Defendant said he did, "but not with [plaintiff] unwell."

Defendant claimed plaintiff was diagnosed with schizophrenia and "was ordered by the judge to get psychiatric care with medicine and if she doesn't get that she's supposed to be removed from all contact with" Reece. He asserted the judge assigned to their divorce case was going to be "removed" the following week, at his attorney's request, stating that after the judge reviews "the best interests report that says [Reece] shouldn't live with [plaintiff] anymore, it needs to be done."[3]

Defendant then said, "So I'm only here on one capacity and one capacity only, to save my son. If you do that meeting, he has texted and talked to me relentlessly for the last forty-eight hours, nervous. It took me everything to talk him off the edge last Sunday." Thomas said he had "trouble believing" defendant because he lied to Thomas whenever they talked. Defendant asked what he needed to do so Thomas would believe him, and offered to have Thomas speak with his attorney and read the best interests evaluation.

---

[3] As discussed during the FRO hearing, defendant's disclosure of the best interests evaluation may have been in violation of a protective order entered in the divorce matter but is irrelevant to the resolution of the FRO.

A-2833-23

Thomas insisted the "kids are going to meet up," to which defendant responded, "No they're not going to meet up because [Reece] doesn't want to do it." Defendant asked Thomas why the meeting had to occur at that time, and the following exchange occurred:

> Defendant: So you're going to put my son in the position, if my son hurts himself because of this meeting I will hold you personally responsible.
>
> Thomas:    Okay.
>
> Defendant: And I will probably kill you. Because my son means everything to me, alright? You send me an email and I respond to it immediately . . .

Thomas interrupted defendant, and they proceeded to argue about whether defendant blocked him on his phone, and then continued:

> Defendant: I'm only reaching out to you because of my son.
>
> Thomas:    I will tell him not to do anything. Okay?
>
> Defendant: No, no, you don't know him, you don't know anything about him.
>
> Thomas:    I'll tell him not to meet them. Okay?
>
> Defendant: Please? Because he wants to meet you. We've talked, you met him, I said when things calm down it'll be appropriate.

A-2833-23

Thomas then immediately pivoted to accusing defendant of owing their mother money, and the two continued that dispute for another twenty seconds until the video ended. Although not captured on video, defendant and Thomas continued their conversation in the house and the meeting ended civilly with a handshake.

Around 12:45 p.m. that day, plaintiff, unaware this discussion occurred, entered Reece's room while he was on a call with defendant and defendant's mother. This encounter was audio recorded. After the parties argued back and forth for over four minutes about phone call logs, defendant's control of Reece, a pending court case involving defendant and his mother, and defendant's finances, the following exchange occurred:

> Plaintiff: We're supposed to be somewhere fifteen minutes ago and now you've done it again.
>
> Defendant: That meeting's been cancelled, sorry.
>
> Plaintiff: Excuse me?
>
> Defendant: That meeting's been cancelled.
>
> Plaintiff: What's wrong with you?
>
> Defendant: You.
>
> Plaintiff: You're disgusting.

7

> Defendant: That meeting's been cancelled. If you really cared, you would have done that ten years ago.

Plaintiff testified this exchange made her "[s]cared. Threatened. Intimidated and harassed. Just controlled again. Just those were my plans." She then texted Susan, who told her defendant cancelled the get-together.[4] Susan forwarded plaintiff the doorbell camera video from earlier that day. Plaintiff testified the video scared her, stating "I saw the message [defendant was going to kill Thomas] as it was me, not [Thomas]." She also said defendant fabricated the issues regarding her mental health and Reece's suicidal ideations.

Plaintiff also recounted domestic violence incidents from 2014 through 2019, wherein defendant sexually assaulted her, threatened her, hit her with a door, locked her in the basement, and pushed her into a stove, shattering the glass. She also testified defendant forced her to run around the outside of the house naked in exchange for his paying the mortgage and because she interfered with the cameras he placed around the house. She produced undated screenshots of text messages alluding to her running around the house naked, although the isolated text messages do not contain the entire conversation between the

---

[4] Thomas testified he cancelled the get-together based on the conversation with defendant.

 A-2833-23

parties. Plaintiff also testified defendant was a "fighter pilot" during Operation Desert Storm and an expert marksman, and had two AR-15 assault rifles.

Plaintiff acknowledged she did not see defendant from November 2019 to May 2021, during which there were no other acts of domestic violence. On cross-examination, she testified she needed an FRO "[b]ecause [defendant] won't give up his guns."

In contrast, defendant testified he went to his brother's house out of concern for Reece, based on their conversations wherein Reece expressed a reluctance to go to the get-together. He also said he was concerned because of information about Reece contained in the best interests report.

Defendant explained he made the statement about killing Thomas because he "wasn't getting the gravity of how this was affecting [Reece], or how [defendant] perceived it to affect [Reece]." He offered Thomas "an alternate solution[] . . . [to] wait six or seven months [until] things calm down." Defendant also claimed he did not know the conversation was being recorded.

Defendant denied committing any of the alleged prior acts of domestic violence, instead providing his version of the incidents to which plaintiff testified. His daughter corroborated his denial of locking plaintiff in the basement, testifying the lock had been turned around so it was impossible, and

9

his denial of pushing her into the stovetop, instead recounting the parties told her plaintiff tripped and fell into it.

After considering testimony of the parties, Susan, Thomas, defendant's daughter, and Reece's guardian ad litem, the court issued its oral decision. The court began by discussing the May 1 video call, wherein defendant told plaintiff the meeting had been cancelled:

> [A]t that point, when he makes those three statements, the only communications that [plaintiff] has heard about is from [Susan] indicating that they're going to change the location of their get-together from a place in New Jersey to a place in New York. And then when she's going in to leave, to gather [Reece], [plaintiff] hears [defendant] address her directly, repeating three times, . . . that your meeting is cancelled, . . . don't even bother leaving the house. I have so scared my brother and his wife and their family that they're not going to be participating in your attempt to rekindle a relationship that I do not want you to rekindle.

> Whether it's because he doesn't want [plaintiff] to develop a relationship with his sister-in-law or whether it's a concern about the child having a relationship with the cousins or perhaps it's the fact that the child may someday say, hey, dad, why did you do that. I don't know what his motivation is, but whatever his motivation is, he undertook the cancellation of this family event. He injected himself into the home sphere of the plaintiff and caused annoyance and caused alarm.

> . . . I really struggled to find how it's possible that the court could not find that this entire scheme of

10

cancelling this particular meeting, this family meeting, was not designed to annoy or alarm [plaintiff]. . . . It was all part of a unified whole.

The . . . demand and then ultimately the threat and then ultimately the cancellation of the meeting would find its way to [plaintiff] and she would know, once again, who is the boss. And it's not her. It's the person who has been dominating and controlling her throughout the marriage and a significant portion of her adult life.

In discussing credibility, the court noted defendant behaved inappropriately repeatedly during the hearing:

Now the record will reflect that there were many times that I looked to [defendant] as I am now and tried to correct his behavior, tried to explain to him that while he's being described as this overbearing, in-charge king of the world, no matter what room he's in, it's his room, his life, his rules, his decision, his power, . . . that's not the case here. And that if he's going to act that way in front of me, he probably should recognize that that's going to be observed by me and be commented on [by] me at a time like this, like perhaps when I'm making a decision finding that he in fact is a domestic abuser.

So, and even here, . . . he can't help himself. Even here in response to [plaintiff's counsel]'s argument regarding the rape testified to by . . . plaintiff—and whether he contested the rape or contested the date of the rape, it's really not material because I find that [plaintiff]'s testimony here is very credible. It's very compelling. She provides detail. She provides context. She provides the court with the confidence necessary to

11

make the finding that she's telling the truth here. That what she says is true.

The court explained it had "difficulty" in "wrap[ping] all of that conduct into a direct communication to [plaintiff]," but concluded:

> This is all part of . . . an ongoing effort to assert power and control even from Florida, the place where if she leaves bad things will happen, that he's a marksman, that he has an AR-15, all of those things that he said to her in the past are all part of the path. It's all part of the framework of this case. It's all part of what has impacted [plaintiff] . . . and continues to impact her so severely at the hands of [and] in response to the behavior of [defendant].

The court noted the prior history of domestic violence, as detailed by plaintiff, and concluded an FRO was necessary to protect her: "[I]t's quite obvious to the court that she is in a position where she fears for her future. She worries that . . . his continued efforts to exert dominance and control in her life will continue without the protections of the order." Based on these findings, the court entered the March 26, 2024 FRO.

On appeal, defendant argues the court erred in finding his communications to Thomas constituted harassment, failing to address the second prong of <u>Silver</u>

12

v. Silver, 387 N.J. Super. 112 (App. Div. 2006), and precluding testimony of the doctor who performed the best interests evaluation.[5]

## II.

Ordinarily, "[i]n our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). However, reversal is warranted when a trial court's findings are "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). Likewise, "if the court ignores applicable standards, we are compelled to reverse and remand for further

---

[5] The court and counsel discussed the relevancy of Dr. LaCouture's testimony at sidebar on March 1, 2023, after which the court indicated it was uncertain whether the best interests evaluation was necessary. On March 2, 2023, defense counsel asked the court to review the evaluation in camera, but the court said it would "hold off on that." On June 27, 2023, the court again discussed the issue of Dr. LaCouture being a witness and advised counsel to submit briefing on the issue. It was again discussed on September 14, 2023, when the court indicated it would set up a case management conference. There was no further mention of the report or testimony, and it is unclear whether the court decided the issue.

A-2833-23

proceedings." Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008). However, our review of a trial court's legal conclusions is always de novo. C.C. v. J.A.H., 463 N.J. Super. 419, 428-29 (App. Div. 2020).

Under the first prong of Silver, the court must determine whether the plaintiff proved, by a preponderance of the credible evidence, the defendant committed one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a). 387 N.J. Super. at 125. If the court finds the defendant committed at least one predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126.

As to the first prong of Silver, plaintiff alleged defendant committed the predicate act of harassment. Because the trial court's decision interposes two sections of the harassment statute, we discuss both.

In relevant part, N.J.S.A. 2C:33-4 provides a person commits the offense of harassment if, "with the purpose to harass another," the person:

> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> . . . .

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

While both sections require an intent to harass, "[t]he statute distinguishes between 'communications' and 'language' that violate the statute in subsection (a), and 'conduct' and 'acts' that do so in subsection (c)." State v. Burkert, 231 N.J. 257, 272 (2017).

Although the court did not recite the statutory provision on which it relied, it appears to have found harassment under subsection (c). We therefore first address whether defendant's actions constituted a course of conduct because "the primary thrust of N.J.S.A. 2C:33-4(c) is not to interdict speech, but rather conduct." Burkert, 231 N.J. at 273. "Even though N.J.S.A. 2C:33-4(c) does not define 'course of conduct' as it applies to harassment, the Legislature has clarified that in other contexts, such as stalking, 'two or more' instances of behavior covered under the statute is sufficient." N.T.B. v. D.D.B., 442 N.J. Super. 205, 222 (App. Div. 2015) (citing N.J.S.A. 2C:12-10(a)(2)).

Although the court did not explicitly state what it determined to be a course of conduct, the record does not support such a finding. If, as the court noted, the objectionable conduct was defendant's "entire scheme of cancelling

15

this particular meeting," the court's findings are unclear what conduct was involved in the "scheme," and whether this constituted a course of conduct.

Even if we consider defendant's three communications—his text messages to Susan, visit to Thomas's house, and statement to plaintiff that the get-together was cancelled—to be a course of conduct, the record nevertheless does not support a finding of harassment. To survive constitutional challenges of vagueness or free speech, a "finding [of harassment] must be supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." State v. Burkert, 444 N.J. Super. 591, 600 (App. Div. 2016) (quoting N.T.B., 442 N.J. Super. at 222). "[T]he victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose." N.T.B., 442 N.J. Super. at 222 (quoting J.D., 207 N.J. at 487). "There is rarely direct proof of intent, and purpose may and often must be inferred from what is said and done and the surrounding circumstances." State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006).

We reiterate the court's findings as to defendant's intent in causing the meeting to be cancelled:

> Whether it's because he doesn't want [plaintiff] to develop a relationship with his sister-in-law or whether it's a concern about the child having a relationship with the cousins or perhaps it's the fact that the child may

16

someday say, hey, dad, why did you do that. I don't know what his motivation is, but whatever his motivation is, he undertook the cancellation of this family event. He injected himself into the home sphere of the plaintiff and caused annoyance and caused alarm.

We have no doubt the cancellation of the get-together, which was caused by defendant's actions, annoyed plaintiff. And although it ceased after 2019, we also do not discount the history of domestic violence. However, "[t]he Supreme Court has emphasized the care a trial court must exercise to distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G. v. R.G. 449 N.J. Super. 208, 225 (App. Div. 2017).

Having considered the opposing testimony of the parties and their witnesses, the trial court could not discern a purpose to harass plaintiff. Because our review of the record also reveals no evidence to support this necessary element, we are constrained to reverse the finding of subsection (c) harassment.

We next consider whether defendant's conduct constituted harassment under subsection (a), which criminalizes "one or more communications . . . [in] any other manner likely to cause annoyance or alarm." N.J.S.A. 2C:33-4(a). This "catchall language . . . was intended to 'encompass only those types of communications that also are invasive of the recipient's privacy,' a purpose that

would not run amiss of any constitutional proscription." Burkert, 231 N.J. at 282-83 (quoting State v. Hoffman, 149 N.J. 564, 583-84 (1997)).

A defendant can commit harassment by communications through a third party. That offense "requires a purpose that encompasses two objects—harassment . . . and 'causing' [a third party] to make the communication." Castagna, 387 N.J. Super. at 605. In that case, the defendant had a conversation with the plaintiff's uncle, during which he informed the uncle about the parties' marital difficulties, the plaintiff's TRO against him, and his concerns about losing his employment and pension as a result. Id. at 602. In a "plea for help," the defendant asked the uncle to contact the plaintiff to "tell her that [the parties] can end this amicably." Ibid. We held the defendant's communication with the plaintiff's uncle did not constitute harassment because the evidence failed to demonstrate the "defendant had a purpose of harassing [the plaintiff] by causing her uncle to communicate an alarming message." Id. at 605.

Unlike the defendant in Castagna, who made a direct request for a third party to relay a message to the plaintiff, there is no evidence to support a finding defendant caused Thomas to relay a harassing communication to plaintiff. To the contrary, defendant repeatedly told Thomas he was there out of concern for Reece. Defendant's statements he would "hold [Thomas] personally

responsible" and "will probably kill [Thomas]" if something happened to Reece were directed solely at Thomas. While we do not condone the contents of the communication, nothing in this exchange supports a conclusion defendant's intent was to cause a harassing communication to plaintiff.[6]

The trial court found defendant's communications to Thomas caused him to cancel the get-together, which defendant knew would be transmitted back to plaintiff. Because cancelling the get-together caused her annoyance, the court found harassment. This conclusion is flawed for the same reason subsection (c) harassment was not established—the record did not support a finding defendant intended to harass plaintiff by causing the meeting to be cancelled. As the trial court recognized, defendant could have been concerned about his son's mental health, not wanted plaintiff or his son to spend time with his estranged family members, or for some other reason amounting to domestic contretemps.

On this record, we are persuaded the evidence did not support a finding of harassment. We therefore reverse and vacate the FRO. Finally, because a

---

[6] Plaintiff's statement she saw defendant's message to Thomas—"I will probably kill you"—as directed at her does not alter our analysis, because whether communications constitute harassment is an objective, not subjective, determination. See N.T.B., 442 N.J. Super. at 222.

19

predicate act has not been established, we do not address the remainder of defendant's arguments on appeal.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2833-23