# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4909-17T4

N.M.Q.,

    Plaintiff-Appellant,

v.

M.A.T.,

    Defendant-Respondent.

_____

Submitted January 16, 2020 – Decided February 7, 2020

Before Judges Alvarez and Suter.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-0701-18.

Mc Carter & English LLP, and Partners for Women and Justice, attorneys for appellant (Scott Michael Weingart, on the brief).

Respondent has not filed a brief.

PER CURIAM

On May 1, 2018, a Family Part judge vacated a temporary restraining order (TRO), and dismissed N.M.Q.'s complaint and amended complaints filed under the Prevention of Domestic Violence Act of 1991, N.J.S.A. 2C:25-17 to -35 (the Act). Over the course of the three trial days, N.M.Q. moved into evidence, among other things, approximately 100 text messages and more than forty voicemails defendant M.A.T. sent her during the twenty-four hours after she had left the house they shared with their eleven-year-old daughter. In support of her amended complaints, N.M.Q. also moved into evidence audio recordings of three incidents during which defendant berated her, threatened her, struck her, and on one occasion, engaged the parties' daughter, who at the time would have been approximately nine years old, in the conflict. Defendant did not testify.

We now reverse, reinstating the complaints and TRO, and remanding the matter for entry by the trial court of a final restraining order (FRO) in accord with this decision. We find as a matter of law that N.M.Q. met the statutory prerequisites for the issuance of an FRO and the test outlined in Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006). On remand, the court shall address other relief the parties sought, such as resolution of parenting time and child support, if not already disposed of in separate proceedings.

The judge allowed M.A.T.'s counsel to cross-examine N.M.Q. regarding a years-old diagnosis of major depressive disorder, recurrent, with psychosis. M.A.T. did not proffer any expert testimony or report explaining the condition. N.M.Q. was closely cross-examined about the medication she had been prescribed. She denied taking it for months prior to the Thanksgiving Day 2018 incident that caused her to file the complaint.

N.M.Q. testified that on that day M.A.T. had accused her of smoking his cigarettes and he became so angry that he demanded she leave the house. M.A.T. also directed his anger towards N.M.Q.'s adult daughter, who was there doing laundry; he hit the washing machine and said he did not want anyone using it. N.M.Q. left shortly after with her daughters. The day before, M.A.T. and N.M.Q. had gotten into a fight about purchasing a toy for their daughter. He spit in N.M.Q.'s face and pushed her in the forehead with his index finger. He did the same later that night and prevented her from calling the police by taking her cell phone.

In closing, M.A.T.'s attorney argued that N.M.Q.'s "mental illness" justified the volume of phone calls and texts because of M.A.T.'s "concern[] about her and the safety of his daughter." Counsel also argued that N.M.Q. had fabricated the accusations, claiming that courts in the past had heard the

A-4909-17T4

allegations, and taken no action. Counsel did not expand upon this reference or offer any details to flesh out the assertion. Because N.M.Q. had no scars, did not go to a doctor, and did not file police reports, counsel suggested she was not credible. Counsel ascribed her allegedly dishonest testimony, and allegedly false claims of harassment and assaults, to her intent to move to Florida with the parties' child.

N.M.Q.'s attorney responded that not only did N.M.Q. have at least three recordings of M.A.T. engaging in assaultive behavior before Thanksgiving 2018,[1] she had presented numerous screen shots of text messages and transcripts of voicemails left by M.A.T. N.M.Q.'s adult daughter also witnessed M.A.T.'s violent temper, and had described the incident that triggered the filing of the complaint. Counsel reminded the judge of defendant's documented threat to kill himself because of N.M.Q.'s departure, and anger at the possibility N.M.Q. might be romantically involved with someone else. Counsel referred to recordings played in court of earlier confrontations between the parties, in which

---

[1] N.M.Q. required the services of an interpreter in court. She employed a translator to convert the voicemails, text messages, and recordings into English, in addition to providing transcripts in Spanish. Both versions were admitted into evidence and are included in the appendix.

A-4909-17T4

M.A.T. had threatened that if he found N.M.Q. with "another guy, I will go to jail and lose everything, but you, they won't recognize you. You, they won't recognize you. I'm going to kill you . . . I'm going to kill you." N.M.Q.'s attorney thus took the position that the predicate acts of contempt,[2] N.J.S.A. 2C:29-9(b), harassment, N.J.S.A. 2C:33-4, and assault, N.J.S.A. 2C:12-1, had been established by ample credible evidence.

In reaching his decision, rendered from the bench, the judge noted the differences between the allegations in the initial complaint N.M.Q. filed when self-represented, and the amended complaints filed after she retained counsel. The complaint was amended twice to include past incidents of harassment and assault. The judge summarized N.M.Q.'s testimony regarding years of domestic violence, pointing out that she did not previously apply for a TRO.

The judge also said,

> [T]he issue goes to the plaintiff's credibility in the sense that she was very inconsistent in her testimony as to whether she did or didn't have the issue beyond . . . depression, whether or not . . . she was prescribed medication, when she discontinued medication, the information that was provided relative to physicians. There was a great deal of inconsistency in that regard. But, again, I want to reiterate that the fact that she has mental health issues, or that anyone has mental health

---

[2] N.M.Q. and her daughter both testified they had seen M.A.T. drive by N.M.Q.'s home, in violation of the TRO.

A-4909-17T4

issues is not dispositive as to whether they can be victims of domestic violence.

The judge characterized the 140 combined texts and phone calls as "the defendant reaching out to the plaintiff repeatedly about bringing their daughter back, about how he loves the plaintiff, and how he loves their daughter, and that he has rights, too." He found no purpose to harass, and that therefore N.M.Q. did not carry her burden of proof as to that predicate offense.

Additionally, the judge considered N.M.Q.'s filing of the complaint to have been motivated by M.A.T.'s threat to charge N.M.Q. with kidnapping their daughter. The judge found N.M.Q. had not proven assault, including an incident during which N.M.Q. testified M.A.T. pushed her in the forehead with his index finger and disconnected her phone when she attempted to call the police. He concluded the absence of police reports, or documentation of physical injuries, meant N.M.Q. had not established the predicate offense of assault.

With regard to N.M.Q.'s claim that defendant repeatedly drove by her house in violation of the TRO, the judge further found N.M.Q. presented no credible evidence because no calls were made to police. N.M.Q.'s adult daughter corroborated the allegation as to at least one occasion. The judge did not discuss the adult daughter's testimony. N.M.Q.'s desire to relocate to Florida also diminished her credibility, in his opinion.

6

A-4909-17T4

Finally, while ruling on N.M.Q.'s credibility, the judge said:

> there has been no change in [N.M.Q.'s] demeanor in any way, shape or form from beginning to end. She was evasive in response to some questions. She was inconsistent in response to other questions on cross-examination, and she just continues to look down without there being any reaction whatsoever, no eye contact with this Court at all. Even her tone was . . . moderated, which is unusual throughout the course of testimony in these cases during my experience.

Citing to Silver v. Silver, the judge concluded no "immediate danger to person or property warrant[ed] the entry of an FRO."

"The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). The court recognizes the special expertise of judges hearing matters in the Family Part and accepts their findings when evidentially supported. Id. at 412.

However, we are not bound by "[a] trial court's interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995). This court reverses to ensure there is no denial of justice from a conclusion that is "clearly mistaken"

7

or "wide of the mark." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007).

"When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016). Such rulings are reversed on appeal only where "so wide off the mark that a manifest denial of justice resulted." Ibid. (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999) (internal quotation marks and citation omitted)). The lynchpin of admissibility through relevance is whether a logical connection exists between proffered evidence and a fact in issue. See State v. Garrison, 228 N.J. 182, 195 (2017). If the evidence makes an inference more probable than not, that suffices. Ibid. The material fact must be one actually in dispute. Ibid.

When the judge overruled N.M.Q.'s objection to questioning regarding her prior mental health diagnosis, he did not ask M.A.T.'s attorney for a proffer. Thus at that point in time, the judge did not know how the evidence would be relevant—likely to support a fact in issue—as opposed to merely a broad-brush attack on the victim. This was a case, unlike most, in which the domestic violence complainant had actual proof of harassing conduct in addition to her

8

testimony—she had text messages, voicemail recordings, and audio tapes. The relevance of the diagnosis was not obvious.

The evidence was not admissible on the basis that it would per se weaken her credibility. It is self-evident that mental health conditions as a general category, past or present, do not make a witness incredible, particularly in this context where there was ample objective evidence corroborating her testimony. The judge's meaning was not clear when he said, in analyzing N.M.Q.'s credibility, "that the fact that she has mental health issues, or that anyone has mental health issues is not dispositive as to whether they can be victims of domestic violence."

In this case, M.A.T.'s attorney argued only in closing, not before, that the 140 combined texts and calls in a twenty-four-hour period were justified by M.A.T.'s concern for the welfare of N.M.Q. and the parties' daughter because of her past mental health diagnosis. That is an unconvincing argument because the record is devoid of any suggestion that N.M.Q.'s conduct posed a threat to herself or others. Only M.A.T. threatened suicide as a result of the relationship ending. Nor did M.A.T. proffer expert testimony that would have aided the court in understanding N.M.Q.'s diagnosis. And M.A.T. did not testify.

9

N.M.Q. on appeal objects to the admission of the testimony—but without having a record including a proffer and explanatory ruling, we cannot even determine whether allowing the cross-examination was an abuse of discretion. The relevance was marginal, if at all, because of the tenuous connection between M.A.T.'s knowledge of N.M.Q.'s diagnosis and his 140 text messages and phone calls. M.A.T.'s attorney did proffer a logical connection, albeit a very weak one and only at the end of the case, between the evidence and a material fact in issue—whether the post-separation conduct was harassment. Hence, we do not reverse on this ground.

We consider the judge's recollection and interpretation of the testimony, however, to be unsupported by the actual record. Given N.M.Q.'s unrefuted proofs, she readily met her burden by a preponderance of the evidence establishing that M.A.T. had the intent to harass.

The statute defines harassment as occurring when an individual, with the purpose to harass another person:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> . . . .

10

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4.]

"A finding of a purpose to harass may be inferred from the evidence presented." State v. Hoffman, 149 N.J. 564, 577 (1997). A court can also use common sense and experience to inform that determination. Ibid.

The definition of harassment includes "'annoy'; 'torment'; 'wear out' and 'exhaust.'" State v. Castagna, 387 N.J. Super. 598, 607 (App. Div. 2006). 140 unsolicited communications in a twenty-four-hour span would have that effect, and meet the definition.

The tenor and sheer number of the phone calls and messages establish the intent to cause "annoyance or alarm," and constitute repeatedly committed acts that can only be explained as having been engaged "with purpose to alarm or seriously annoy." N.J.S.A. 2C:33-4(a) and (c). Common sense informs that M.A.T.'s communications were far more than expressions of regret, or a desire to reconcile, or a request to have contact with his child. They were intended to wear out, exhaust, or intimidate N.M.Q. into returning. See Castagna, 387 N.J. Super. at 607.

The judge did not analyze the voicemails and texts under the harassment statute, because he summarily concluded that no intent to harass was present. He merely found M.A.T.'s purpose was to connect with N.M.Q. and the child, and went no further. The judge omitted mention of the fact, for example, that some of these text messages and voicemails refer to M.A.T.'s fears that N.M.Q. was involved with another man, obviously not subject matter related to reconciliation, or visitation. Since the judge heard a recording of defendant threatening to kill N.M.Q. if she were involved with someone else, that statement alone should have given the judge pause.

The findings in this case ignored ample substantial and credible evidence that more than adequately established at least harassment. We do not reach the allegations of assault or contempt given that conclusion.

The judge did not mention N.M.Q.'s adult daughter's testimony or rule upon her credibility. Her testimony, however, was also unrefuted and thus corroborative of N.M.Q.'s testimony regarding defendant's explosive conduct on Thanksgiving 2018, and on prior occasions. Thus, in addition to drawing unwarranted conclusions from some testimony, the judge failed to mention significant portions of the evidence.

A-4909-17T4

The judge's stated rationale for denying N.M.Q. relief, because he found her incredible, made no mention whatsoever of the greater part of the proofs. He selectively discussed two or three voicemails or texts, ignoring the rest. He did not touch upon the audio recordings or N.M.Q.'s adult daughter's testimony.

The judge incorrectly applied the two-step test for the issuance of an FRO as found in <u>Silver</u>, 387 N.J. Super. at 125-27. He erroneously considered the second prong when he found that no predicate act had occurred, the first prong of the test. Since he opined that no predicate act occurred, no discussion of <u>Silver</u> was necessary.

Additionally, his understanding of the second prong was also wide of the mark. The judge opined that there was no "immediate danger to person or property warranting the entry of an FRO." But immediate danger to person or property is only one factor to consider when determining whether to issue an FRO. <u>Id.</u> at 127; N.J.S.A. 2C:25-29(a)(1) to (6). It is only an element of the statute. N.J.S.A. 2C:25-29(a)(2).

The second prong requires the victim to demonstrate an ongoing need for protection; an FRO is necessary to protect from immediate danger or to "<u>prevent further abuse</u>." <u>Silver</u>, 387 N.J. Super. at 127 (emphasis added). Here, that was established by M.A.T.'s language in the 140 texts and voicemails, persistent and

intense reaction to N.M.Q.'s departure, a years-long history of at least verbal if not physical abuse, and as N.M.Q. and her daughter testified, M.A.T.'s presence on at least two occasions near N.M.Q.'s home despite the TRO.

We hold, based on this record, that N.M.Q. was entitled to an FRO as a matter of law. She established that defendant committed the predicate act of harassment as defined in N.J.S.A. 2C:33-4(a) and (c). Having found a predicate act occurred, the first prong of Silver, we also hold the second prong is satisfied—there is a need to protect her from further abuse. We therefore reverse and remand for the entry of an FRO in accord with this decision.

We recognize that in granting N.M.Q.'s application for an FRO, we are exercising original jurisdiction, a step taken only "as is necessary to the complete determination of any matter on review." R. 2:10-5. This authority is "exercised only with great frugality and in none but a clear case free of doubt." In re Boardwalk Regency Corp. Casino License, 180 N.J. Super. 324, 334 (App. Div. 1981). However, a court's "[r]esort to original jurisdiction is particularly appropriate to avoid unnecessary further litigation, as where the record is adequate to terminate the dispute and no further fact-finding or administrative expertise or discretion is involved, and thus a remand would be pointless . . . ."

Price v. Himeji, LLC, 214 N.J. 263, 294 (2013) (quoting Vas v. Roberts, 418 N.J. Super. 509, 523-24 (App. Div. 2011)).

The proofs in this case are free of doubt. The record is replete with recordings and writings establishing harassment as a matter of law. Those same proofs establish, as a matter of law, N.M.Q.'s entitlement to protection under the Act. No additional fact-finding is needed. To remand for further proceedings would only generate unnecessary litigation.

The record does not indicate if M.A.T.'s parenting time and support obligation require judicial intervention. Therefore, the matter must be rescheduled within thirty days of this decision in order for the court to address those issues. The FRO shall be prepared and entered immediately in the Family Part and distributed in the normal course. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4909-17T4