# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3846-23

M.Z.,[1]

    Plaintiff-Respondent,

v.

L.Z.,

    Defendant-Appellant.

_____

Submitted June 4, 2025 – Decided August 8, 2025

Before Judges Currier and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FV-16-1991-24.

Einhorn, Barbarito, Frost, Botwinick, Nunn & Musmanno, attorneys for appellant (Matheu D. Nunn, Bonnie C. Frost and Jessie M. Mills, on the brief).

Respondent has not filed a brief.

---

[1] We use initials to protect the domestic violence victim's privacy. R. 1:38-3(d)(10).

PER CURIAM

Defendant L.Z. appeals from the June 18, 2024 final restraining order (FRO) entered against her and in favor of plaintiff M.Z. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant argues the trial court erred in finding plaintiff established the requisite predicate acts or the need for permanent restraints under Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Further, defendant appeals from the July 19, 2024 order granting plaintiff's request for $6,125 in counsel fees. Following a review of the record and the applicable legal principles, we affirm.

I.

Plaintiff and defendant were pending divorce after being married for almost two years at the time of the FRO hearing, and share a two-year old son. Plaintiff filed for divorce in January 2023, and obtained a temporary restraining order (TRO) on March 17, 2024, alleging predicate acts of stalking, N.J.S.A. 2C:12-10, and harassment, N.J.S.A. 2C:33-4. The following facts are derived from the hearing, during which both plaintiff and defendant testified.

A.    Predicate Acts of Domestic Violence

Plaintiff testified that he sought a restraining order after defendant threatened and repeatedly stalked and harassed him. At the time of the threats,

A-3846-23

plaintiff's girlfriend lived with him at the parties' former marital residence.[2] Plaintiff pursued the TRO after discovering defendant sitting alone in the car outside his residence. Plaintiff described feeling "[t]errified" because defendant "threatened to kill [his girlfriend] and then a few moments after that, she specifically mentioned that . . . [plaintiff should] be careful [him]self." He explained he was fearful considering defendant previously lived in the home and "kn[ew] the ins and outs as good as anybody else." Plaintiff played a recording of the telephone call in which defendant made these threatening statements, explaining it occurred "a few days before [he] went" to the police station to obtain the restraining order.

Plaintiff explained defendant had been physically watching him, and played another recording from March 11, 2024 at approximately 8:36 p.m., when defendant called and told him his car alarm was going off, which made him "feel like [he was] being watched, . . . [he was] not safe in [his] own home, and it[ was] very off-putting." He claimed defendant had been entering the home without his consent despite an agreement between the parties requiring her to give plaintiff advance notice. He cited one occasion when he went out for a brief time and upon returning discovered defendant had broken in, and she told

---

[2] Plaintiff's girlfriend is also a protected party under the FRO.

A-3846-23

him she and "her aunt had rummaged through the house and . . . found medication that [he is] prescribed in the home and t[ook] pictures and tried to use that against [him]." He expressed particular concern because he had changed the front door locks and garage code.

He explained defendant appeared "a handful of times," which he approximated to be upwards of five to twenty between October 2023 and March 15, 2024. He did not call the police every time because she is "the mother of [his] child" and he "tried to make this as civil as humanly possible." Plaintiff described feeling alarmed and "feel[ing] like [he was] under a microscope" and claimed defendant also "asked [his next-door neighbor] to take videos and photos of [him]," testifying that "it[ was] unsettling in a house that . . . [he was] supposed to be living in peacefully." He stated defendant's behavior caused him to feel "controlled," "manipulated," and "definitely afraid."

Plaintiff described defendant harassed him with text messages and calls, and he introduced screenshots from his phone depicting multiple messages defendant sent, all within a minute of each other. He said this was illustrative of "exactly how [his] texting conversations would go with her. It would be rapid fire, just overwhelming." He also presented a screenshot of a portion of his phone's call log, displaying seventeen unanswered calls from defendant on May

4

2, 2023.  Plaintiff testified he received these "types and numbers of phone calls" "[e]very day," and introduced a second screenshot of a call log showing over twenty unanswered calls from February 22.  Plaintiff testified that when he did answer the calls, defendant "was always very angry" and "would make threats, [and] accusations repeatedly, and they would be completely out of left field." He explained his mother also received calls from defendant, which she would not answer.

Plaintiff recounted another occasion on which defendant called and "suggested that the two of [them] meet somewhere alone," specifically claiming "[s]he had mentioned that she wanted to apologize to [him] in an open field with no recording devices where nobody could hear [them] in the middle of nowhere," and suggested plaintiff not bring his phone.  Plaintiff indicated he was "truly afraid of" defendant, stating he needed the protection of a restraining order "for even the safety of . . . [their] son" and believed defendant "need[ed] to be controlled at . . . a very serious level[] [f]or [his] safety."  He stated, "What she's capable of doing is terrifying."

Plaintiff also identified multiple times defendant allegedly called the police and made false reports, including once on Christmas in 2022.  He explained, "She had claimed that [he] was irate and burning her Christmas gifts

in . . . the fireplace." Plaintiff also claimed defendant called the police "after [his] former counsel had advised [him] to record any and all contact with [defendant] because she . . . ha[d] these tendencies to go off the handle." Plaintiff explained "when she had found out [he] had a recorder on [him], she threw [him] out of [his] house and called the police." Further, plaintiff expressed fear that defendant has "access to a mass artillery of weapons" kept by her father.

Plaintiff conceded he did not pay child support for "at least the last few months," but reasoned he withheld payments because "[i]t was . . . seemingly the only leverage [he] had," expressing he was "completely alienated from [their] child" and he "had no contact with [their] son for over [ninety] days" and "another [twenty-eight] days" at one point. Plaintiff testified he filed an application to enforce his parenting time, which at the time of the hearing was still pending before the court. Plaintiff further stated that, despite a consent order between the parents providing him with "liberal parenting" time, he had not seen the parties' child until the court intervened two weeks before the FRO hearing. Ultimately, he claimed that, in the last five months, he saw his son for a total of eighteen hours.

A-3846-23

Defendant testified, denying the allegations. She stated that when she informed plaintiff that she filed a motion to reduce plaintiff's parenting time, plaintiff responded, "[O]kay, I'm going to do what I have to do." She indicated plaintiff then fabricated that "he saw [defendant] stalking or lurking around his neighborhood" and pursued the restraining order. Defendant testified she never intended to stalk or harass plaintiff; she "just want[ed] to co[-]parent nicely for [their] son." She also claimed she has never shot a gun, although she admitted that her father owns guns, which are stored at her father's residence in "a locked safe downstairs in the basement that [she] do[es not] have access to."

She explained she went to the area of the marital home as she remains "very good friends with" plaintiff's neighbor and their "kids play together" so she "visit[s] there often." Defendant introduced photographs of their son with the neighbor's child. Defendant admitted she was near plaintiff's home on March 15, 2024, but claimed that she was present for only three minutes to drop off a gift for the neighbor's daughter. She indicated plaintiff was "exaggerating" when he said he saw defendant by his home "[twenty] times." Defendant denied enlisting neighbors to watch, record, and inform her about plaintiff. Regarding the car alarm incident, she testified the neighbor texted her that plaintiff's car alarm was sounding, and it was "a bit concerning because it was for a long period

7

of time." Defendant said she then called to inform plaintiff about the car alarm, but conceded she never told him that a neighbor had told her. Defendant admitted to entering plaintiff's home periodically, but never without his consent.

Defendant explained she contacted plaintiff when their son was upset and wanted to speak to plaintiff. When confronted by specific entries on the call log and asked why she would call plaintiff "two more times in quick succession" at 10:59 p.m., defendant responded, "I understand that. Emotions were high. I understand that." She admitted to threatening plaintiff's girlfriend, but said she had no intention of killing her. She explained she said, "I'll kill her," because "[a]s a mother, [her] emotions were very high" after learning their son's "diaper wasn't changed" and because she thought her young son had said plaintiff's girlfriend's name.

Defendant denied making false police reports about plaintiff. She testified that she called the police on Christmas in 2022, after witnessing plaintiff "throwing gifts into the fireplace" and claimed "[h]e said he wanted to burn everything and anything pertaining to [her]." She explained she obtained a TRO against him, which was later dismissed. Defendant played a recording of the incident, which depicted plaintiff advising defendant he was burning items defendant gave him.

B.    The Trial Court's Decision

On June 18, 2024, the court granted the FRO, giving its reasons in a comprehensive oral decision.  The court recognized jurisdiction and recounted the trial testimony, making detailed credibility determinations.  The court found plaintiff was "very credible[,] [h]is testimony was direct and forthright," and "[h]e answered questions without hesitation and freely agreed to correct his testimony when presented with evidence to the contrary."  It deemed him "very sincere, emotional, and steadfast," and found, despite defense counsel's "vigorous cross-examination," he remained "consistent and credible."  Rejecting defendant's claim that plaintiff filed the TRO strategically to gain advantage in the custody dispute, "the [c]ourt was not persuaded that . . . [plaintiff] had such an improper motive."  It recognized "plaintiff became understandably emotionally upset during his testimony regarding the denial of access to the parties' son, and . . . found his testimony to be very genuine and sincere."

Conversely, the court found defendant neither "entirely credible nor convincing."  It found her testimony "contained conflicting information at various moments" and "observed that . . . defendant spoke in a very low voice and had to be continuously reminded to speak up[,] . . . look[ing] down a lot,"

A-3846-23

indicating "[s]he was visibly nervous." Ultimately, the court found "plaintiff's version[] of what transpired . . . more credible and convincing."

Regarding the predicate acts, the court credited plaintiff's testimony that he felt fearful and "on pins and needles" due to defendant's calls and communications. The court found "defendant never denied sending the texts or making the numerous phone calls," instead denying only her intent to harass without any ability to recall why she called plaintiff repeatedly "despite having several months to refresh her recollection."

The court cited the undisputed recording of defendant "using offensively coarse language, threatening to kill . . . plaintiff's girlfriend, and warning . . . plaintiff that he'd better be careful." The court found defendant "simply rationalized her actions by commenting that tensions were high." It also recognized that defendant "never denied making the phone call to . . . plaintiff regarding the alarm, yet she never disclosed to . . . plaintiff that it was [his neighbor] who had notified her about the alarm."

The court also accepted that plaintiff "saw [defendant] alone in the car" by his house, and thereafter found "it does not seem reasonable . . . that she would be taking the child to the house directly across the street from . . . plaintiff, thereby risking a confrontation with . . . plaintiff over the

10

child." The court found even if defendant was visiting her friend who lived near plaintiff, "[i]t seemed . . . as if she was utilizing these occasions to taunt . . . plaintiff," and it was "more probable that she would be stalking . . . plaintiff in her quest to prove her allegations against him." The court highlighted as "most disingenuous" defendant's statement that "she just wants to 'co[-]parent nicely,'" finding this statement belied by "defendant's actions" to the contrary.

Accordingly, the court found defendant engaged in the predicate act of harassment, citing her "repeated text messages and . . . phone calls to . . . plaintiff," concluding she did so "for the sole purpose to cause annoyance and alarm in  . . . plaintiff." The court additionally found defendant "engaged in the predicate act of stalking . . . when on [March] 15, 2024 and other dates, she maintained a visual and physical proximity to . . . plaintiff by being present around plaintiff's home on anywhere from [five] to [twenty] occasions with the intent to monitor him." It determined "she also engaged in stalking when she made verbal threats to kill plaintiff's girlfriend and warned plaintiff to be careful, thereby causing plaintiff to fear for his safety and that of his girlfriend and his parents."

A-3846-23

Regarding the second prong of Silver, the court noted it "relied heavily on . . . plaintiff's testimony[,] which was essentially uncontroverted." The court accepted plaintiff's testimony "that he believes that he requires a[n FRO] because he is afraid of . . . defendant's threats to physically harm him and his girlfriend and because of . . . defendant's out-of-control behavior." As to coercive control, the court noted "there are some elements that are applicable in this case, particularly the deprivation of the parenting time for . . . plaintiff and the threats against . . . plaintiff, as well as the monitoring of . . . plaintiff's movements." Therefore, the court entered an FRO against defendant.

Plaintiff sought counsel fees, and plaintiff's counsel filed a certification reflecting his fee of $350 per hour, asserting it was reasonable based on the hourly rate of "[l]awyers in [the] area, accomplishing similar work." Plaintiff's counsel itemized the work by hour, accumulating 17.5 total hours of work, totaling $6,125. Counsel "submit[ted] that the time and labor required[,] the difficulty of the matters involved[,] and the skill requisite to perform these legal services, when considered in connection with the amount of [his] fee, indicate [his] charges are fair and reasonable under the circumstances of this case." Defendant opposed the request, noting the disparity between the parties' incomes, plaintiff's lack of good faith in missed child support payments resulting

12

in $6,342 in arrears, his refusal to contribute to the parties' child's health insurance premium, and his failure to "contribute[] towards any expenses incurred on behalf of the parties' child."

On July 19, 2024, by order and written decision, the court awarded plaintiff $6,125 in counsel fees in accordance with N.J.S.A. 2C:25-29(b)(4). It cited and evaluated factors of Rule of Professional Conduct (RPC) 1.5(a), finding: "[p]laintiff's attorney spent a total of 17.5 hours, combined, working on" his case, including trial preparation and securing necessary information for review; factor two was "[n]ot applicable"; plaintiff's attorney's hourly rate was "fair and reasonable given the attorney's respective level of experience" and "in line with such similar fees in this locality"; plaintiff successfully obtained the FRO; factor five "[did] not appear to be a significant factor in this matter"; "[p]laintiff's attorney remained counsel throughout the trial and issuance of an FRO"; plaintiff's attorney has practiced since 1986 and is experienced in family law; and the fee is based on plaintiff's attorney's fixed hourly rate.

The court therefore found the fee "reasonable," noting "[d]efendant did not object to the reasonableness of the fee[]." The court cited N.J.S.A. 2C:25-29(b)(4) as controlling, recognizing the PDVA "expressly provides for reasonable attorney['s] fees as compensatory damages."

On appeal, defendant argues the court erred in:  (1) shifting the burden of proof on defendant; (2) finding the predicate act of stalking as the record did not specify the date or corroborate more than one incident; (3) concluding defendant's messages and calls were made with intent to harass and failing to specify which subsection of the harassment statute applied; (4) relying on orders from the matrimonial proceeding; (5) rejecting defendant's testimony as not credible and ignoring the recordings she presented; and (6) accepting plaintiff's testimony that he feared defendant given that he texted and called defendant the day following the alleged stalking instead of immediately filing a TRO on the day of defendant's alleged threats.  Additionally, defendant asserts the court incorrectly awarded counsel fees, arguing it "erred when it determined that [p]laintiff was a victim of domestic violence" and the attorney's affidavit did not comply with Rule 4:42-9(b) and RPC 1.5(a).

III.

An appellate court's review of an FRO is generally limited.  See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020).  "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and

more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)); see also S.K. v. J.H., 426 N.J. Super. 230, 238 (App. Div. 2012). The appellate court may review the FRO record to determine whether the record as a whole supports issuance of the FRO. See J.D., 207 N.J. at 488. Findings by a court "are binding on appeal when supported by adequate, substantial, credible evidence." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). This court does not disturb a trial court's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). An appellate court's review of legal conclusions is de novo. See C.C., 463 N.J. Super. at 428-29.

When determining whether to issue an FRO pursuant to the PDVA, trial courts must engage in a two-step analysis. See Silver, 387 N.J. Super. at 125-27. The trial court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Upon a finding of a predicate act of domestic violence, the court must then determine whether an

15

FRO is required to protect the party seeking restraints from future acts or threats of violence. Id. at 126-27. "[T]here [must] be a finding that 'relief is necessary to prevent further abuse.'" J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25-29(b)).

We first address defendant's challenge to the court's finding defendant committed the predicate act of stalking. N.J.S.A. 2C:12-10(b) provides "[a] person is guilty of stalking . . . if he [or she] purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer emotional distress." The statute defines "course of conduct" as,

> repeatedly maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about, a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or toward a person.
>
> [N.J.S.A. 2C:12-10(a)(1).]

The statute defines "[r]epeatedly" as "on two or more occasions"; "[e]motional distress" as "significant mental suffering or distress"; and "[c]ause

A-3846-23

a reasonable person to fear" as "to cause fear in which a reasonable victim, similarly situated, would have under the circumstances."

We perceive no misuse of discretion in the court's finding defendant engaged in stalking, given the ample evidence in the record. The court found plaintiff's testimony—which we have described in detail—credible, and deemed defendant's denials "not persuasive or probable." Giving deference to those findings, plaintiff's testimony was sufficient to establish that defendant physically surveilled or entered plaintiff's residence repeatedly between October 2022 and March 2023, and engaged in repeated acts of harassment.

The court recounted and accepted plaintiff's testimony that demonstrated defendant made threats to kill his girlfriend and warned him to "be careful." It found these threats put plaintiff in reasonable fear, and noted defendant did not deny the threats but discounted them as her emotions running high. The court reviewed the evidence as a whole and reasonably concluded the manner and substance of defendant's texts and calls, her numerous appearances outside plaintiff's home, her monitoring plaintiff herself and through the neighbors, and her entry in his home without consent, sufficiently demonstrated defendant purposefully or knowingly engaged in a repeated conduct that would evoke fear in a reasonable person.

We likewise conclude the court did not err in finding plaintiff established harassment under N.J.S.A. 2C:33-4. To establish harassment under N.J.S.A. 2C:33-4, a person must act "with purpose to harass another" when that person:

> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Intent to harass is often difficult to prove, so "purpose may and often must be inferred from what is said and done and the surrounding circumstances." R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017) (quoting State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006)). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

The court found plaintiff established the offense of harassment by her "repeated text messages and . . . phone calls to . . . plaintiff . . . for the sole purpose to cause annoyance and alarm [to] . . . plaintiff." The court disbelieved

18

defendant's explanation for her conduct and found the quantity and nature of the calls and texts and the specific threats made in offensively coarse language evidenced a purpose to harass. This finding is sufficiently anchored in plaintiff's testimony and the illustrative communications presented to the court. The court properly assessed the "surrounding circumstances," which further evidenced the requisite intent. R.G., 449 N.J. Super. at 226 (quoting Castagna, 387 N.J. Super. at 606).

Having determined the court properly found both predicate acts, and accepted its credibility assessments, we review and reject defendant's challenge to the court's conclusion that the FRO was necessary to protect plaintiff under prong two of Silver. The court found "[p]laintiff's belief in the immediacy of the threat and the likelihood that it would be carried out [wa]s supported by his testimony regarding the prior history of domestic violence" as well as other credible evidence in the record. It noted features of coercive control in defendant's depriving plaintiff of parenting time and actively monitoring him. Therefore, we will not disturb the court's reasoned decision.

We have also carefully reviewed defendant's challenge to the court's granting counsel fees and perceive no error. When a victim demonstrates that attorney's fees "are a direct result of the domestic violence, they are reasonable,

19

and they are presented by affidavit pursuant to Rule 4:42-9(b)," the trial court may award attorney's fees as compensatory losses under N.J.S.A. 2C:25-29(b)(4). Grandovic v. Labrie, 348 N.J. Super. 193, 196 (App. Div. 2002). We accord substantial deference to a trial court's assessment of counsel fees and that determination "'will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion.'" McGowan v. O'Rourke, 391 N.J. Super. 502, 508 (App. Div. 2007) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)). "It would be inimical to the [PDVA] to deny a victim an award of reasonable attorney's fees and costs incurred in successfully defending against a challenge to a[n FRO] . . . ." Grandovic, 348 N.J. Super. at 197.

The court's thorough written opinion found plaintiff was a victim of domestic violence entitled to compensatory damages, and concluded the fee application to be properly supported by affidavit. See R. 4:42-9(b). The court addressed the application, considering in detail each of RPC 1.5(a)'s factors in granting the award. It did not misuse its discretion.

To the extent we have not specifically addressed defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

20

A-3846-23