# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0885-24

L.A.P.,[1]

    Plaintiff-Respondent,

v.

A.A.S.,

    Defendant-Appellant.

_____

        Submitted September 23, 2025 – Decided October 27, 2025

        Before Judges DeAlmeida and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-0619-25.

        Hark & Hark, attorneys for appellant (Michael J. Collis, on the brief).

        Respondent has not filed a brief.

---

[1] We use initials to protect the confidentiality of the victims in these proceedings. R. 1:38-3(d)(10).

PER CURIAM

Defendant, A.A.S., appeals from the October 2024 final restraining order (FRO) entered against him and in favor of plaintiff, L.A.P., under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant argues the trial court erred in finding plaintiff established both the predicate act of harassment, N.J.S.A. 2C:33-4, and the need for permanent restraints under Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Following a review of the record and the applicable legal principles, we affirm.

I.

A.

After ending her romantic relationship with defendant, plaintiff obtained a temporary restraining order (TRO) on October 3, 2024, alleging the predicate act of harassment and a prior history of domestic violence. The following facts are derived from the FRO hearing, during which both plaintiff and defendant testified.

Plaintiff described her relationship with defendant as follows. She met defendant in June 2023, the two began dating the following November, and defendant moved into plaintiff's home in January 2024. From the beginning, the two argued. Plaintiff indicated defendant's verbal abuse began in November

2

2023.  She characterized his behavior as "yelling, screaming, violen[t], angry, upset, [and] unhappy."

Regarding the predicate act of harassment, plaintiff described an encounter with defendant on September 30, 2024, when she was finishing the laundry and asked defendant for assistance with folding the last load.  He refused to help and left the house, after which plaintiff got dressed to leave.  She indicated defendant returned home "in anger" as she was leaving with the dog, and he "pushed [her] out the door," hitting her right shoulder with his hand.  She realized she had left her wallet behind and went back to retrieve it when defendant locked the door at the top and the bottom and told her to put the dog down.  When she complied, defendant "pushed [her] across from the front door to the middle of the living room," and she landed on the floor.  Defendant called her "dramatic" in a "raised" and "threatening" voice, causing her to feel "very scared and confused."

Defendant told her to get up, and as she moved toward a corner, defendant unplugged "a puppy camera," which was capable of recording what took place.  Defendant began "poking [her] in [her] chest, [her] heart," and she described defendant "shoving his two fingers in her jaw, and her teeth just [] threatening [her] and yelling at [her]."  When asked to clarify, she stated, "he used his right

3

hand[] above me pressing down into my face, into my teeth talking to me trying to get me to understand that I'm doing something wrong to him. . . . It was an act of discipline." She added that defendant's poking her chest "was more threatening like, okay, I dare you to try to hit me because I am actually going to attack you if you try to put your hands on me." She explained that her history of panic attacks, about which defendant was aware, required her to "control [her]self" to avoid passing out.

She recalled defendant ran to the front door at one point and returned with a mannequin she used "for designing." He "approach[ed her] trying to almost hit her with the mannequin, but not actually hitting [her] with it, just attempting to put fear in [her] heart." He continued "punching the air very close to [her] saying, '[t]his is what I want to do to you right now.'" He ordered her to sit on the couch. After trying to "rip [her] hoodie," he told her to remove it, which she did. He then "ripped her . . . tank top." She recounted feeling "very scared, confused, threatened" without "any space to defend [her]self." She believed "[t]his person is actually trying to harm me."

Plaintiff explained defendant "t[ook] her to the bedroom," "close[d] the bedroom door," and "t[old] her to sit on the bed." He was angry and yelling, and he took her phone from her. He said, "[o]h, we're crashing out," which she

4

understood as meaning when "you like lose total control of any mental capacity to recognize that you're actually endangering someone and you can't bring yourself back down." She indicated she was not free to leave the room.

Thirty minutes later, defendant returned her phone, opened the door, and told her she was "free to go." She did not leave that night, but decided to end the relationship, although she knew defendant would never leave.

Plaintiff described "looking over [her] shoulders at night" and being "scared in [her] space that [she] pa[ys] for." She then "planned her escape," and on October 2, she told defendant she no longer "fe[lt] safe" and asked that he not return that night. She believes defendant allowed her to leave because she told him she was meeting her mother after work. She planned to return home with a friend to pack defendant's belongings and drop them to his parents. After contacting building staff to attempt to change the digital door security code, she texted defendant to remind him he was not to return.

As she and her friend finished packing defendant's belongings that evening, she received a text from defendant stating, "[o]h you locked me out, lol?" She knew it would not be long before defendant found a way inside, as he sent thirty-three text messages. She presented certain messages at trial, admitted without objection to their authenticity, including one in which

5

defendant indicated he had "been roaming around here for hours," and another stating, "[y]ou f'ing liar. You spilled my news and now it's out. I want my stuff. I need my stuff. Open the door."[2]  He began "banging on the door," and, "afraid," she called the police and obtained the TRO.

Plaintiff also testified regarding earlier incidents of abuse. She indicated defendant began cursing and calling her "b[****]" in November 2023. She recounted defendant's episodes or anger, explaining, out of rage, he "destroyed a bathroom" and "shattered it." She described an incident on August 11, 2024, when he struck her when she tried to remove his headphones during an argument after he called her "the B word" and the devil. Two weeks later, when the two were away, he became angry, took her phone, and locked her in a room.

Plaintiff presented additional screenshots of text and social media messages, which she characterized as threatening, including several from August 11. Plaintiff read one message during her testimony stating, "You will cry. I promise you, because this 'blank,' you're going to pay for it." Another message chain was provided in which plaintiff identified threatening language. Additional communications sent by defendant after entry of the TRO were

---

[2]  The text messages were not included in the record on appeal, so we rely on the testimony about and characterizations of the messages. Plaintiff read only some of the content into the record.

presented in which defendant apologized and admitted to "the trauma and the hurt" he caused.

Plaintiff testified that she believed she needed a permanent restraining order because, without protection, defendant "w[ould] find a way to come get [her] and finish what he wants to do." She explained:

> I don't feel safe. Every time I leave the house I'm []
> afraid that this person is going to come and get me or
> find me and I still have plans to travel abroad and that's
> scary and frightening to think that someone will
> actually choose to invoke harm, danger, and violence
> on another person not just once but several times.

Defendant then testified, denied plaintiff's allegations, and claimed he had been "abused physically and emotionally in the relationship." He acknowledged the two argued on September 30, but indicated that he never held plaintiff "hostage" and he never "took her phone. . . . [He] asked her to give [him] her phone." He explained that he asked for her phone in response to her accusing him of "infidelity." He admitted telling her they should go in the room in order "to calm the situation by bringing the volume down." He indicated he "didn't push her out" but he "did touch her because [they] touch each other," but he never hit her. He claimed plaintiff hit him in the past. He testified plaintiff has called his mother a "b[****]."

A-0885-24

Defendant denied ever holding plaintiff against her will and explained the two "always talk[ed] to each other," and "the whole captive situation, that's just not true." He explained, although his messages included an admission that he "hurt," "raised his voice," and "rough[ed] [plaintiff] up," he was apologizing "out of desperation," but not admitting plaintiff's allegations. He called plaintiff manipulative and deceitful, and he denied abusing or harming her.

B.

The court rendered its oral decision after closing arguments, placing its findings on the record and entered an FRO. The court found jurisdiction under the PDVA based on the parties' prior dating relationship. The court then made detailed credibility findings, deeming plaintiff "incredibly credible," noting her "good eye contact," preparation, and "prompt and intelligent answers." Describing her "very even tone[]," the court found plaintiff "was not dramatic at all," showing appropriate emotion without "exaggeration." It noted her willingness to answer all questions, finding her "completely believable and her testimony carried the day."

The court noted defendant appeared to "make good eye contact," was "prepared," and "initially appeared a bit credible." However, the court found, once defendant perceived "the case wasn't going well," he "played the victim

A-0885-24

card and claimed to be the one that was manipulated and the victim here, which the court does not believe."

The court found plaintiff established the predicate act of harassment. Specifically, it found an argument occurred over the laundry on September 30, 2024, after which defendant "berated" plaintiff, called her names, made accusations, "pushed her into the door," and "poke[d] her in the chest." The court noted defendant behaved in this manner even while he was aware of plaintiff's mental health issues. It found defendant, in his denials, "actually admitted to everything the plaintiff said," including entering the bedroom to "diffuse the situation." Further, the court emphasized that defendant admitted he took plaintiff's phone, claiming he only did so after requesting she give it to him. The court credited plaintiff's detailed account of the September 30 incident, stating it "d[id not] believe" defendant's claims. The court found the "coercive control by defendant" "extremely troubling." It noted defendant's "taking the phone, putting her in a room, cutting off contact with family or friends and then saying you are free to go as if he own[ed] her or control[led] her."

Regarding the events of October 2, 2024, the court concluded the evidence was "overwhelming[ly] consistent with what the plaintiff testified to." The court

cited to the contemporaneous communications from defendant "hurling insults and insults," and threatening, "you will cry, I promise you bro because this sh[**] you're going to pay for it." It found the behavior and communications were "meant to harass and annoy." The court highlighted defendant's later admission: "I apologize for all the harm I've caused you and I take full responsibility for the things that can't be undone. I hurt you when I raised my voice at you. I hurt you when I rough you up trying to get a point across." The court referenced defendant's social media post apologizing for "all the trauma [he] caused," "the hurt," and the "abuse[]," noting defendant's testimony blaming plaintiff for "manipulat[ing] him." It explained, "the court doesn't believe that."

Addressing the need for future restraints, the court relied upon plaintiff's testimony regarding defendant's conduct and the history of domestic violence, which began as verbal abuse and escalated. The court found plaintiff reasonably feared for her safety and concluded an FRO was needed to safeguard her from danger of future abuse.

## II.

Defendant appeals and argues the court erred in finding defendant committed the predicate act of harassment and future restraints were necessary. He contends plaintiff did not establish he possessed an intent to harass and

presented only her "subjective fears" of future abuse by defendant, which was insufficient to warrant permanent restraints.

### A.

An appellate court's review of an FRO is generally limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)); see also S.K. v. J.H., 426 N.J. Super. 230, 238 (App. Div. 2012). "Appellate courts owe deference to the trial court's credibility determinations as well because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).

Findings by a trial court "are binding on appeal when supported by adequate, substantial, credible evidence." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). This court does not disturb a trial court's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154

A-0885-24

N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Further, we may review the FRO record to determine whether the record as a whole supports issuance of the FRO. See J.D., 207 N.J. at 488. Legal conclusions are reviewed de novo. See C.C., 463 N.J. Super. at 428-29.

When determining whether to issue an FRO pursuant to the PDVA, trial courts must engage in a two-step analysis. See Silver, 387 N.J. Super. at 125-27. The trial court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. Upon a finding of a predicate act of domestic violence, the court must then determine whether an FRO is required to protect the party seeking restraints from future acts or threats of violence. Id. at 126-27. "[T]here [must] be a finding that 'relief is necessary to prevent further abuse.'" J.D., 207 N.J. at 476 (quoting N.J.S.A. 2C:25-29(b)).

B.

We first address defendant's challenge to the court's finding defendant committed the predicate act of harassment. To establish harassment under N.J.S.A. 2C:33-4, a person must act "with purpose to harass another" when that person:

> a. Makes, or causes to be made, one or more communications anonymously or at extremely

12

A-0885-24

inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Defendant specifically alleges the court erred in finding that plaintiff established the requisite intent to harass. Intent to harass is often difficult to prove, so "purpose may and often must be inferred from what is said and done and the surrounding circumstances." R.G. v. R.G., 449 N.J. Super. 208, 226 (App. Div. 2017) (quoting State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006)). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

We are satisfied that the court's finding of harassment was sufficiently anchored in the record. The court made detailed credibility determinations, explaining why it found plaintiff highly credible and disbelieved defendant. It found plaintiff's account of events more believable and supported by the attendant communications than defendant's and noted defendant's denials further corroborated plaintiff's account.

13

We perceive no error in the court's finding that defendant physically and verbally abused plaintiff, on September 30, 2024, October 2, 2024, and the days in between, attempting to threaten, alarm, control, and harass her. The record amply demonstrated defendant's behavior—including shoving and poking plaintiff, cordoning her off and restricting her movement and ability to summon help, taking her phone, texting insults and threats, and banging on the door to gain entry to the home after being told to leave—reflected sufficient purpose to harass and constituted harassment within the meaning of the statute.

We next review and reject defendant's challenge to the court's conclusion that the FRO was necessary to protect plaintiff under prong two of <u>Silver</u>. The court found plaintiff's belief in the future risk of continued domestic violence was genuine and objectively reasonable given the history of abuse and other credible evidence in the record. The court detailed the history, emphasized the features of coercive control in defendant's conduct, and noted defendant's casting himself as a victim to justify his conduct. Accordingly, we conclude the court's finding of the need for future restraints is firmly rooted in the record, and we will not disturb the court's reasoned decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

14

A-0885-24