# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1261-24

R.A.M.S.,[1]

    Plaintiff-Respondent,

v.

A.D.M.D.,

    Defendant-Appellant.

_____

Argued January 22, 2026 – Decided March 4, 2026

Before Judges Mawla and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-2823-24.

Stephanie Palo Solop argued the cause for appellant (Solop Bondarowicz & Gargulinski, LLC, attorneys; Stephanie Palo Solop, on the briefs).

Diana Nelson (Pillsbury Winthrop Shaw Pittman, LLP) of the New York bar, admitted pro hac vice, argued the

---

[1] We use initials for the parties and pseudonyms for the children to protect the parties' privacy and the confidentiality of the proceedings in accordance with Rule 1:38-3(d)(10).

cause for respondent (Matthew D. Stockwell, on the brief).

PER CURIAM

Defendant A.D.M.D. appeals from the December 13, 2024 amended final restraining order (FRO) entered against him in favor of plaintiff R.A.M.S. pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -25. We reverse and vacate the FRO for the reasons expressed in this opinion.

I.

The parties were married in 2010 and divorced in 2017, but remained in a relationship until they permanently separated in 2019. They have two children together, a son N.M. (Nathan) born in February 2009 and a daughter S.M. (Sarah) born in August 2018. At the time of the alleged predicate act, both children resided with plaintiff. Defendant did not have court-ordered parenting time with either child and had only seen them sporadically in the prior three or four years. Prior to February 2024, defendant last went to plaintiff's residence to see Sarah on her birthday in 2023.

The pertinent facts underlying the predicate act are essentially undisputed. In the days before Nathan's fifteenth birthday, defendant sent him text messages, but he did not respond. According to Nathan, who testified during the FRO hearing, he did not want to have a relationship with his father because of the

2

parties' prior history of domestic violence, which he had witnessed as a young child.

On February 6, 2024, three days before Nathan's birthday, defendant sent plaintiff a string of text messages inquiring about the children's shoe and clothing sizes, asking her to tell Nathan to respond to his text messages, and telling her he wanted to stop by to see Nathan on his birthday. Plaintiff responded that the children did not need shoes, and defendant should call Nathan directly. She did not answer defendant's request to stop by her residence.

On Nathan's birthday, defendant sent another text message to plaintiff asking if he could see him, but did she did not respond. At approximately 5:00 p.m., while plaintiff, her sister, and the children were home watching television, defendant rang plaintiff's doorbell. On direct examination, plaintiff testified she could not approximate how many times defendant rang the bell, but on cross-examination, she testified it was "more than five" times in a row. Defendant admitted to ringing the bell twice. Nathan saw it was defendant, and no one answered the door. Defendant was there less than a minute, and then he left.

The next morning at approximately 10:00 a.m., defendant stopped by plaintiff's residence and rang the doorbell. Plaintiff testified he rang the bell

A-1261-24

three times, and defendant testified he rang it only once. When no one answered, he left.

Plaintiff testified the following day, February 11, 2024, she heard the doorbell ring but did not see defendant. She saw defendant's girlfriend's car but did not see defendant or any other occupants of the car. Plaintiff said Nathan saw defendant, but Nathan did not testify he saw defendant on the eleventh. Defendant denied leaving his house that day.

Plaintiff testified she was scared because of the prior history of domestic violence. She recounted the following incidents during their relationship: sometime between 2011 and 2013, defendant gave her a black eye by punching her with a closed fist; in 2014, he pushed her into a window, which broke the glass; in 2018, while she was pregnant with their daughter, she intervened when defendant hit Nathan, and defendant grabbed her and tried to "kick . . . [her] out of the house"; also in 2018, defendant was driving in the car with plaintiff and Nathan, and he "start[ed] to drive like crazy, saying that he was going to kill everybody and nobody's going to know"; and in October or November 2019, defendant pulled her off the couch while she was breastfeeding their daughter, resulting in a burn on her arm.

4

In December 2019, plaintiff obtained a temporary restraining order (TRO) against defendant, based on his threats to contact immigration and report her undocumented status. The TRO also referenced the October or November 2019 incident as a prior act of domestic violence. Plaintiff voluntarily dismissed the TRO because she was afraid defendant would report her to the police or immigration. After defendant came to her house around Sarah's birthday in August 2023, plaintiff texted defendant he "d[id]n't have permission to come to [her] door," and never retracted that statement.

Nathan testified defendant "used to grab [plaintiff] and push her." He said defendant "would always be reckless driving whenever he would get mad," and recalled an incident wherein defendant "started speeding without having a second thought with [the family] being" in the car. Nathan "was in the front seat, and . . . started crying and screaming at him for him to stop because he was putting all of [their lives] at risk simply because he was mad." Nathan also recounted his input to the judge in the parties' custody matter, wherein he said he did not want to see defendant.

Plaintiff's sister corroborated the March 2018 and February 9, 2024 incidents. She also witnessed an argument between the parties in December 2010, wherein defendant pushed plaintiff into a wall.

A-1261-24

Plaintiff's mother described an incident in 2010 wherein defendant grabbed plaintiff by the arms during an argument. He then took a knife and ripped his own shirt, threatening to "go[] to the police and to immigration and say [plaintiff] had been the one to rip his shirt."

The mother also testified defendant came to plaintiff's house around Sarah's birthday in 2023. Defendant "rang the bell," and she went downstairs to the door with Sarah in her arms. She said defendant "took [her] girl away" and "asked if he could go around with her," to which she said no. Plaintiff's mother told defendant: "[Y]ou're complicating my life. Give me the girl. I'm going back up." She took Sarah back. Defendant asked where Nathan was, she told him Nathan was sleeping, and then defendant left.

Defendant denied committing any prior acts of domestic violence. He said he was only at plaintiff's house for "probably fifty seconds or less" on February 9. Defendant testified as to the next day:

> On the tenth I went to Newark to have a haircut in the morning, so I passed by and I thought that I could see, you know, stop by and say hello to my son because it was his birthday and that was the reason that I stopped by, because I didn't have any communication for the prior year, and it was already like more than two years without seeing my son, and I was worried about his health and how he's doing, right? Because we do have the connection between us, and I don't want to lose that connection.

A-1261-24

Defendant said he was "there . . . for less than [thirty] seconds." He denied returning to the house on the eleventh, contending he was cooking for friends who were coming over. Defendant also disputed plaintiff's statement she was delayed in filing for the TRO, instead claiming she obtained the TRO because she had been served with a motion he filed in the custody matter.

The court found all the witnesses credible except for defendant, whom it found "to be very credible at times . . . and then other times, not so credible." Defendant "presented very professionally," was well-prepared, and "answered . . . questions thoughtfully and deliberatively, but he . . . place[d] blame on . . . plaintiff, calling her the aggressor or the manipulator, or just flat-out deni[ed]" the allegations of prior domestic violence. Because plaintiff's testimony had "specificity and detail" and was corroborated by other witnesses, the court credited her version of events over defendant's.

Accordingly, the court made the following findings of fact:

> On February 9, 2024, that was [Nathan]'s birthday. . . . [D]efendant was not invited to come to . . . plaintiff's home. He appeared at the residence on that day. He rang the doorbell five times. [Nathan] saw him, closed the curtain. He was scared. He told . . . plaintiff that . . . defendant was there. They did not answer the door. This is around 5:00 p.m.
>
> On the next day, . . . defendant came back to the residence again uninvited, rang the bell a couple times,

7

two, three times, around 10:00 a.m. On the next day, [February 11], . . . plaintiff saw the car that . . . she had seen . . . defendant driving pass by her house. She's not sure he was in it, but he was there the last two days and that was the same car. . . . [P]laintiff previously told . . . defendant not to come to the house. Despite that, he came anyway.

The court then addressed the predicate act of harassment under N.J.S.A. 2C:33-4(c):

Now, in this case, . . . the predicate act in those February dates is certainly on its face not the most . . . serious . . . of allegations that there ever were. However, in determining whether a defendant's conduct is likely to cause the requisite annoyance or alarm to the victim, . . . defendant's past conduct towards the victim and the history of the relationship must be taken into account. See State v. Hoffman, 149 N.J. 564 (1997). The finding of a purpose to harass can be inferred from the evidence and from common sense experience[.] See H.E.S. v. J.C.S., 175 N.J. 309 (2003).

So in this case, just ringing the doorbell a bunch of times on one day, coming back the next day, coming back the third day, it doesn't on its face, without looking into the history, see[m] so significant. But past history can inform a . . . predicate act and a court can determine that ambiguous incident could qualify as prohibited conduct based on a finding of violence in the parties' past[.] See Cesare v. Cesare, 154 N.J. 394, 402 (1998).

The court has to consider the totality of the circumstances to determine whether harassment has been violated. [Cesare, 154 N.J.] at 404.

Appearing at someone's home uninvited, again, not the strongest of predicate acts. However, . . . this court finds there is a lengthy previous history in this case of domestic violence and because of that lengthy history, . . . [the court] find[s] that those incidents on [the] ninth, tenth, and the eleventh, do qualify as harassment by a preponderance of the evidence under N.J.S.A. 2C:33-4(c), repeatedly committed acts, these were at least three different acts . . . and knowing that he wasn't permitted or invited to be there, having been told in the past not to come to the home, [and] coming anyway. That, plus the past history [the court] find[s] [a] preponderance of the evidence has been shown under section (c). Based on those findings, . . . plaintiff has satisfied prong one of Silver v. Silver.[2]

The court then recounted the prior history of domestic violence and determined an FRO was necessary to protect plaintiff against future acts of domestic violence.

On appeal, defendant contends the court abused its discretion in finding he committed the predicate act of harassment and that there was a need for an FRO. For the first time on appeal, he argues the court erred by permitting plaintiff to testify to a prior history of domestic violence not contained in the TRO, which violated his due process rights, and failed to adequately maintain the record in this case, which infringed his right to a fair and complete review

---

[2] 387 N.J. Super. 112 (App. Div. 2006).

of the matter. Defendant further avers the court erred by declining to enter a parenting time schedule and requiring him to file a motion.

## II.

Ordinarily, "[i]n our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12. However, reversal is warranted when a trial court's findings are "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). Likewise, "if the court ignores applicable standards, we are compelled to reverse and remand for further proceedings." Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008). However, our review of a trial court's legal conclusions is always de novo. C.C. v. J.A.H., 463 N.J. Super. 419, 428-29 (App. Div. 2020).

Under the first prong of Silver, the court must determine whether the plaintiff proved, by a preponderance of the credible evidence, the defendant

10

committed one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a). 387 N.J. Super. at 125. If the court finds the defendant committed at least one predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126.

As to the first prong of Silver, plaintiff alleged defendant committed the predicate act of harassment. N.J.S.A. 2C:33-4(c) provides a person commits the offense of harassment if, "with purpose to harass another," the person "[e]ngages in any . . . course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." The statute requires both an intent to harass and a course of "'acts' that do so in subsection (c)." State v. Burkert, 231 N.J. 257, 272 (2017). "Even though N.J.S.A. 2C:33-4(c) does not define 'course of conduct' as it applies to harassment, the Legislature has clarified that in other contexts, such as stalking, 'two or more' instances of behavior covered under the statute is sufficient." N.T.B. v. D.D.B., 442 N.J. Super. 205, 222 (App. Div. 2015) (citing N.J.S.A. 2C:12-10(a)(2)).

Given the deference due to the trial court, we discern no abuse of discretion in its credibility determinations and findings of fact. The record established defendant appeared at plaintiff's residence without prior permission

11

and rang the doorbell on three consecutive days—his son's birthday and the two days after. We part company, however, with the court's conclusion this conduct constituted harassment.

To survive constitutional challenges of vagueness or free speech, a "finding [of harassment] must be supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." State v. Burkert, 444 N.J. Super. 591, 600 (App. Div. 2016) (quoting N.T.B., 442 N.J. Super. at 222). "[T]he victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose." N.T.B., 442 N.J. Super. at 222 (quoting J.D. v. M.D.F., 207 N.J. 458, 487 (2011)). "There is rarely direct proof of intent, and purpose may and often must be inferred from what is said and done and the surrounding circumstances." State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006).

We do not disregard Nathan's strong objection to having a relationship with defendant, but that is an issue to be resolved in the parties' custody matter. Likewise, we do not minimize the history of domestic violence perpetrated on plaintiff by defendant over the course of their relationship. But while "the trial court is permitted to examine the totality of the circumstances, especially and

including the context of domestic violence," Hoffman, 149 N.J. at 584, that consideration may not subsume the requisite finding of an intent to harass.

Defendant contacted plaintiff days before Nathan's birthday, asking to stop by to see him. Although plaintiff responded cordially to other messages in that text string, she did not respond to his request to come to her house, either to permit or deny him. On Nathan's birthday and the two days afterward, defendant went to her residence, rang the bell, and when no one answered, left within a minute. While plaintiff testified she was scared, her subjective reaction is insufficient to establish defendant's objectively improper purpose. And although plaintiff told him he did not have permission to come to her house in August 2023, the facts do not support the conclusion that when defendant returned for their son's birthday in February 2024, he did so with the purpose to harass her.

On this record, we are persuaded the evidence did not support a finding of harassment and are therefore constrained to reverse and vacate the FRO. Because a predicate act has not been established, we do not address the remainder of defendant's arguments on appeal.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

13